No. 92,233

BRIAN D. PHILLIPS, *Appellant,* v. STATE OF KANSAS, *Appellee.*

144 P.3d 48

Opinion filed October 27, 2006.

*Janine Cox,* of Kansas Appellate Defender Office, argued the cause, and *Nathan B. Webb,* of the same office, was on the brief for appellant.

*Boyd K. Isherwood,* assistant district attorney, argued the cause, and *Nola Tedesco Foulston,* district attorney, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Brian D. Phillips was convicted by a jury of first-degree murder and sentenced to life imprisonment. His conviction was affirmed by this court in *State v. Phillips,* No. 70,936,

an unpublished opinion filed April 21, 1995. In June 2003 Phillips filed a motion pursuant to K.S.A. 60-1507. It was denied after an evidentiary hearing. He appealed to the Court of Appeals, which affirmed in a *per curiam*, unpublished decision filed October 21, 2005. This court granted Phillips' petition for review.

The primary issue raised by Phillips on appeal is ineffective assistance of counsel. He contends that trial counsel was ineffective because: (1) He failed to call Larry Marsh to testify; (2) he failed to call certain witnesses; (3) he failed to elicit certain testimony from Joe Trail on cross-examination; (4) he failed to object to the admission of certain evidence; (5) he misinformed Phillips that his criminal record would come into evidence if he chose to testify; and (6) his performance before and during trial was generally ineffective. Phillips also contends that the trial court violated his right to due process by failing to make findings of fact and conclusions of law on the issues raised in his 60-1507 motion.

According to Phillips, the facts recited in the Court of Appeals' opinion accurately represent the evidence presented at trial. Here are those facts:

"On January 30, 1993, Phillips fatally shot Charles 'Robbie' Wilson. On the night of the shooting, Wilson had assaulted at least five people, including Phillips, over a 2-hour period. Many of the people involved in the confrontations, including Phillips, were teenagers who had gathered at Ralph and Vickie Martin's residence to socialize and consume alcohol.

"The group was talking in the living room when Wilson, who had also been drinking, stopped by the Martins' residence. Wilson had recently been released from prison, where he had been serving sentences for aggravated battery and attempted aggravated robbery. Wilson began acting 'macho' and relating his experiences from prison. Vickie warned the others to be careful around Wilson because he was 'crazy,' 'violent,' and 'mean.'

"James Kasinger took a drink of Wilson's Crown Royal whiskey without asking permission. Wilson became angry with Kasinger, took off his shirt, and wanted to fight. Ralph and Vickie told Kasinger that Wilson was not 'right in his head.' Wilson continued yelling in Kasinger's face, stating, 'I'll kill you and then I'll rape you.' Wilson began punching himself in the face, reporting that he felt no pain. Wilson hit Kasinger once before calming down.

"Wilson engaged in several additional confrontations as the evening progressed. Joe Trail and Richard Parker commenced a friendly wrestling match on the living room floor. Wilson jumped in and grabbed Trail by the neck and started to choke him. Several people told Wilson that it was a friendly contest, but he did not stop

choking Trail. Farrell Marsh jumped up to pull Wilson off Trail, but Wilson picked Farrell up and threw him against the wall, breaking the sheet rock. Wilson then 'started beating on Farrell.' Farrell did not fight back but just curled into the fetal position to try to protect himself. Marsha Milan testified she thought Farrell's life was in danger due to the force of Wilson's punches. When Milan and Deanna Seglum tried to intervene, Wilson punched Milan in the shoulder and injured Seglum's wrist. At this point, Wilson began hitting himself in the face and chest again. He then calmed down and apologized.

"Phillips, who had witnessed Wilson's erratic behavior, left the residence with Cheryl Dover. Wilson followed Phillips outside and began punching and kicking him. Wilson threatened that he was going to take Dover home and 'fuck her brains out.' Wilson put Dover in a headlock, and Phillips tried to get him to let go. Wilson hit Dover and she fell down. He then grabbed Phillips and put him in a headlock. Wilson threatened to break his neck. He was holding Phillips by the hair, kicking him, and punching him in the face. Nicholas Marsh, Farrell's brother, testified that when Wilson finally let go of Phillips, 'Brian fell down and everybody thought he was dead at first.'

"Wilson again began hitting himself in the face and stated, 'There isn't any of you punks that can whip me.' Wilson retrieved a 24-inch crescent wrench from the trunk of his car and stated, 'I'll take care of them this time.' He then went back inside the Martins' residence.

"Kasinger saw that Phillips had blood coming out of his mouth, and Kasinger had a conversation with others about what to do. During this conversation, Milan said she heard Phillips state that Wilson 'needed to go down.' Trail said that several people, including Phillips, stated that someone was going to end up shooting Wilson.

"Kasinger went to the home of Larry Marsh, the father of Nicholas and Farrell, and he obtained Phillips' shotgun, which was located there. Kasinger told Larry that his son had been beaten by Wilson. Kasinger and Larry drove back to the Martins' residence, and Kasinger loaded the shotgun. Phillips asked for the shotgun, but Kasinger refused. Kasinger and Larry went into the house, and Kasinger then pointed the gun at Wilson to try to get him to leave. Wilson was brandishing the crescent wrench and swinging it at Larry. Kasinger told Wilson to put the wrench down, but he refused. Larry then told Kasinger to take the gun outside, and he complied. Phillips again asked Kasinger for the gun and this time Kasinger gave it to him.

"Larry Marsh walked out of the house with his sons, Nicholas and Farrell. Wilson followed Larry out the front door and approached him with the crescent wrench. Phillips fired a warning shot which did not hit Wilson, and Wilson retreated into the house. Kasinger handed Phillips another shell, and Phillips reloaded the shotgun. Wilson reappeared and again approached Larry with the crescent wrench. Wilson was close enough to hit Larry with the wrench. At this point, Phillips fired a second shot and killed Wilson. At the time of the fatal shot,

[James and Michael] Kasinger and Farrell were running away from the scene. Nicholas was hiding under his father's truck.

"Phillips ran from the residence after he shot Wilson. Kasinger told the police that Phillips stated, 'I shot the motherfucker,' and then laughed, but at the trial Kasinger clarified that it was a nervous laugh. Phillips then hid the shotgun under a bush, but when he heard the sirens, he returned to the scene and spoke with police officers. Phillips was cooperative, and he showed an officer where the shotgun was located. Phillips admitted killing Wilson, but he told the officers that he did not intend to kill him. Phillips stated that he just wanted Wilson to drop the wrench and leave."

## The defense theory: The jury was instructed that Phillips

"claimed his conduct was justified as self-defense and/or the defense of another person.

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force. Such justification requires both a belief on the part of Mr. Phillips and the existence of facts that would persuade a reasonable person to that belief."

In opening statement, defense counsel told the jury the evidence would show that defendant shot Wilson but lacked criminal intent in that "his intent was to disarm Wilson." Defense counsel told the jury to expect evidence of four incidents in which Wilson's conduct had been menacing—when James Kasinger took a drink of Wilson's whiskey, when Trail and Parker were wrestling, when Phillips and Dover were outside the Martins' house, and when Wilson threatened Larry Marsh with the crescent wrench. In closing statement, defense counsel told the jury the evidence showed that at the moment he was shot Wilson was wielding the crescent wrench "toward both Larry Marsh and Mike Kasinger." He referred the jury to "testimony that Wilson had the wrench up and poised to swing just prior to being shot," and recalled the expert opinion that the 24-inch steel crescent wrench could be a deadly weapon. Defense counsel asserted: "Larry Marsh, Michael Kasinger were assaulted in a manner that was inevitable to cause death or great bodily harm," and "[t]he law allows deadly force to stop deadly force."

Michael Kasinger testified that he was on the porch, approximately 5 feet away, when Wilson came out the front door swinging

the wrench. Michael Kasinger jumped off the corner of the porch into the grass and moved away. According to Michael Kasinger, Wilson continued moving toward Larry Marsh "like he was gonna hit him or something." Wilson was approximately 5 feet from Larry Marsh, and Marsh was backing away from him.

In addition to Michael Kasinger, two other eyewitnesses to Wilson's threatening Larry Marsh testified at trial—James Kasinger and Nicholas Marsh. The testimony of the three witnesses will be examined in the discussion of Issue 1, which centers on trial counsel's failure to call Larry Marsh as a witness.

Phillips' statements to police. The record on appeal contains the transcripts of four police interviews with Phillips that occurred within hours of the shooting. At trial, the transcriptions were not admitted into evidence, but audiotapes of the interviews were admitted and played for the jury. The transcriptions were admitted into evidence at the 60-1507 hearing.

In none of his interviews did Phillips tell police that he shot Wilson because Wilson was threatening Larry Marsh. Instead, the story related by Phillips to police in the interviews downplayed Phillips' intent to shoot Wilson and made the shooting sound more accidental than purposeful. In the first interview, Phillips did not mention Larry Marsh. In the second interview, Phillips, asked how he got the shotgun, mentioned that some people had showed up, including "Ferrel's dad." In the third interview, Phillips did not mention Larry Marsh. In the fourth interview, when directly asked about Larry Marsh, Phillips answered the following questions:

"Q. Okay. Did you see him go in the house?
"A. A—no, I didn't.
"Q. Did you see him out there at all?
"A. I seen him outside once and then I looked off and then looked back I didn't see him again.
"Q. Okay. Do you remember when you saw him? Was it before you shot [Wilson] or after?
"A. It was before.
"Q. Where was Larry at?
"A. He was over to the side of me walking like he was going towards the backyard."

Later in the same interview, Phillips was asked and answered these questions:

"Q. Jimmy [Kasinger] say anything about why he was giving you the rounds?
"A. No, he was likeshoot this motherfucker.
"Q. Did you ask him why don't you do it or anything?
"A. No, he just handed me the gun and took off running.
"Q. And told you to shoot him? Okay. Is there anything else that you haven't told me about in any of our interviews, that you remembered?
"A. No, just thatthe reason, I guess, Farrel's dad was there was cause his youngest son, Nick, was there too.
"Q. How old is Nick?
"A. About 12.
"Q. Was Nick drinking?
"A. No.
"Q. So, Farrel's dad just came to get Nick and take him out of there?
"A. I guess so because I guess Nick got hurt because Richard started wrestling with him—Richard threw him on the floor and hurt his shoulder.
"Q. Okay.
"A. And he sat in the livingroom all night."

In his 60-1507 proceeding, Phillips has placed great emphasis on his defense of Larry Marsh. But at trial there was evidence of unintentional shooting, self-defense, and defense of others, both James Kasinger and Larry Marsh.

Additional facts will be developed as needed for discussion of particular issues.

### Trial Attorney's Failure to Call Larry Marsh to Testify

Before counsel's assistance is determined to be so defective as to require reversal of a conviction, the defendant must establish two things. First, defendant must establish that counsel's performance was deficient. This requires defendant to show that counsel made errors so serious that counsel's performance was less than that guaranteed to a defendant by the Sixth Amendment to the United States Constitution. Second, the defendant must establish that the deficient performance prejudiced the defense. The performance and prejudice prongs of the ineffective assistance of counsel inquiry each are mixed questions of law and fact so that an appellate court's review is de novo. *State v. Mathis*, 281 Kan. 99, 109-10, 130 P.3d 14 (2006).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. There is a

strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. To show prejudice, defendant must show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence before the judge or jury. 281 Kan. at 110.

Phillips did not deny shooting Wilson. His theory of defense included lack of criminal intent, self-defense, and defense of others. K.S.A. 21-3211 provides: "A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force."

Phillips' trial counsel did not contact Larry Marsh during his investigation of the case and did not call Larry as a witness at trial. At the 60-1507 evidentiary hearing, trial counsel testified that he did not contact Larry Marsh because he thought the evidence necessary to Phillips' defense would be provided by other witnesses. Phillips argues that without Larry Marsh's testimony the imminent threat necessary to support the defense theory of defense of another, Larry Marsh, could not be established.

With regard to defense counsel's failing to contact Larry Marsh during the investigation and to call him as a witness at trial, the Court of Appeals stated that defense counsel failed to show that force was necessary to defend against Wilson's imminent use of unlawful force. Slip op. at 20. But the Court of Appeals concluded that, by not calling Larry Marsh as a witness at the 60-1507 hearing, Phillips failed to establish that his defense was prejudiced by defense counsel's not calling Larry as a witness at trial: "If Larry's testimony would have been so crucial at trial, it seems logical that Phillips would have called him as a witness at the 60-1507 hearing. At this point, there is no record to establish Larry's testimony other than statements contained in police reports which were discussed at the 60-1507 hearing." Slip op. at 20-21. The Court of Appeals further stated:

"Furthermore, the record reflects that Larry apparently made inconsistent statements to the police. In fact, in one statement Larry made to the police, he testified that the first shot was fired before he had even been threatened by Wilson. This was inconsistent with evidence presented by other witnesses and would have been detrimental to Phillips' theory of defense. The State would have been able to point out these inconsistencies if Larry had actually testified at trial." Slip op. at 21.

In his petition for review, Phillips contends that Larry Marsh's testimony was indispensable to the defense. According to Phillips, only Larry Marsh's testimony could have established that an imminent threat existed against him at the time Phillips fired the fatal shot. Phillips contends that Nicholas Marsh was the only trial witness who saw the fatal shot fired and dismisses the possibility that Nicholas Marsh's trial testimony established the imminent threat against his father. Phillips stated in his petition for review:

"Only one witness testified about the facts as they existed at the moment of the second shot. This witness, 12 year-old Nicholas Marsh, was hiding under a pickup truck, and never mentioned that the victim was holding a two foot long crescent wrench when he exited the house after the warning shot. A jury could have concluded that in spite of evidence indicating that Robbie [Wilson] had threatened many people that night, that Mr. Phillips had not acted in response to an imminent threat when he fired the fatal shot. If the jury relied exclusively on Nicholas' testimony, they could have concluded that Robbie did not have the wrench in his hands when he exited the house after the warning shot. The jury could also have believed Nicholas' testimony that Larry and Robbie were separated by between 15 and 20 feet, and therefore, the threat was not imminent."

Several things about Phillips' statement in his petition for review need to be addressed. First, he makes it sound as if Nicholas Marsh testified that Larry Marsh and Robbie Wilson were 15 to 20 feet apart "at the moment of the second shot." In fact, Nicholas Marsh testified that his dad and Wilson were 15 to 20 feet apart when Wilson was swinging the wrench inside the house:

"Q. Okay. Your dad showed up. How much later?
"A. Uh, just a couple minutes.
"Q. A couple minutes later. What did your dad do?
"A. He came in and told me to go outside.
"Q. All right. Where were you when he said this to ya?
"A. I was in the kitchen.

"Q. Okay. Did he come all the way back to the kitchen or was he in the living room?

"A. He was in the kitchen.

"Q. Okay. Was anybody with him that you saw?

"A. Uh, he came with some people, umm, and they were the ones from the house that went and got him.

"Q. Okay. And when he said that to you, what happened?

"A. Umm, Robbie came in and he had this big wrench and started swinging it at my dad.

"Q. Okay. Now, when you say swinging, what do you mean?

"A. He was kinda aiming like he was gonna hit him.

"Q. Okay. Umm, how far up did he have the wrench?

"A. Uh, he had it up pretty far. My dad was about 15, 20 feet away from him."

Second, Phillips correctly states that the only trial witness who testified that he was watching Wilson when the fatal shot was fired was Nicholas Marsh, but there were two other trial witnesses who testified that they were watching until close to the time the fatal shot was fired. Their testimony resolves both the problems contrived by Phillips—that Nicholas Marsh's testimony (1) did not include that Wilson had the wrench when he came out of the house after the warning shot and (2) did not include how close Wilson was to Larry Marsh when they were outside the house.

Michael Kasinger testified that *Wilson came out swinging the crescent wrench*. Wilson held the wrench like a bat, like he was trying to hurt someone. *Wilson was 5 feet from Larry Marsh*. Wilson was on the porch; Larry Marsh was on the sidewalk backing up. Wilson looked like he was going to hit Larry Marsh. Phillips fired a shot without aiming. Wilson ran in the house. As the witness ran away, he heard another shot.

James Kasinger testified that he took the uncocked gun into the Martins' house. Wilson was waving the crescent wrench at Larry Marsh. The witness pointed the gun at Wilson and told him to put the wrench down. Wilson refused. Larry Marsh told the witness to take the gun outside, and the witness did so. Outside, Phillips asked for the gun and the witness gave it to him. Larry Marsh backed out the front door. *Wilson was close enough to him to take a step and hit Larry Marsh with the wrench*. Phillips fired a warning shot. Wilson went in the house. The witness handed Phillips another

shell. Phillips loaded and cocked the gun. Wilson opened the door slightly, looked around, and then flung the door open and *came out with the wrench*. Larry Marsh was walking toward his truck. As the witness ran away, he heard another shot.

The testimony of Michael and James Kasinger leaves open the question precisely how close Wilson was to Larry Marsh when Phillips fired the second shot. Nicholas Marsh's testimony about the firing of the second shot does not establish where Larry Marsh was at the time and differs from that of the Kasingers' by seemingly having Larry Marsh come out of the front door of the house after the fatal shot was fired.

The Court of Appeals criticized Phillips for not calling Larry Marsh as a witness at the 60-1507 hearing and even suggested that Phillips failed to satisfy his burden of proof as a result. The record from the 60-1507 hearing and the record on appeal, however, include the transcribed police interview of Larry Marsh. It contains information that substantially supports Phillips' defense. The Court of Appeals was off-base in reasoning that "[t]he fact that Larry did not testify at the 60-1507 hearing weighs heavily against Phillips in overcoming his burden" (slip op. at 21). Phillips' point might have been made more emphatically by Larry Marsh's testifying at the hearing, but the transcribed interview contains what was needed to satisfy Phillips' burden of proof—the information Larry Marsh gave to police soon after the shooting and presumably would have repeated had he testified at trial.

Larry Marsh told police that, when he arrived at the Martins' house, Wilson was in the yard. Marsh followed Wilson into the house. Marsh "hollered" for Nicholas. Wilson picked up a big wrench that was propped against the wall. Marsh said to Nicholas, "Get out of here." Wilson started moving toward Larry Marsh with the wrench, and Marsh backed up. They were approximately 10 feet apart. Larry Marsh said, "I just kept backing up and he just kept coming forward." The police interviewer asked if Wilson was saying anything, and Larry Marsh continued:

"Q. How was he carrying this wrench?
"A. He had the wrench on his right shoulder with both hands on it, which means he would be swinging from right to left as he swung it and I was just going straight

backwards. As he reached about the dining room, living room area, I was about halfway thru that area and I heard a gunshot and I . . . .
. . . .
"Q. Did you see who fired that shot?
"A. I had no idea at the time . . . .
"Q. Had you see any weapons at all?
"A. None. I backed up to the front door, Okay, and by time I got to the front door, we were closer together, me and this other guy, probably within 5 ft. of each other and I don't remember where he was sitting, he was in gonna beat my brains in and whatever, I was just . . .
"Q. What was the size of the object he was carrying?
"A. Probably about a 2 ft., 2½ ft. steel wrench, maybe a crescent wrench or uhm a big pipe wrench or something like that. Something that a plumber uses or a big trucker uses to take wheels off of something.
"Q. Okay.
"A. After we go to, after I got to that front door, I just kind of looked around, just far enough to where I just step off that porch and just walk on back and we were probably 5 or 6 ft. out that front door. (Hand clap.) Boom, another shot went. His hands flew in the air. I didn't know what had happened. All I know was I didn't tha . . . His hands were up in the air. I don't know wheth . . . it could have been the police it could have been anybody. I just took off to the right and I, I, I . . . . . Actually I looked out at the truck first. I kind of took to the right and looked at the truck and I didn't see Nicholas in there.
"Q. Okay. Let me stop you and we're going to back up for a minute, okay? As your backing out of the residence, was he looking, the person with the pipe in his hand, who was he looking at?
"A. Straight at me. I mean, he, he didn't take his eyes off of me, nor did I take my eyes off of him.
"Q. What did, what did you feel?
"A. I felt scared that he was going to hit me with that pipe, but I felt safer once I got outside cause I had a way to run if I had to and I knew that I could run faster than him because apparently he was on drugs or something. Uhm from what Jimmy explained you know.
"Q. What do you think would have happened if he would have hit you with that wrench?
"A. He would have hurt me, badly, very badly, that was a big wrench, you know. Even if I'd taken and tried to block it, he could have broke my arm or something.
"Q. Were you in fear of your life?
"A. I was scared. I was scared from the minute I got out of my pickup until the minute I got out that front door and I was still scared because I didn't see my son. I was scared for me because I was scared I was going to get hi[t] with that wrench. So I couldn't take my eyes off of him, see . . .
"Q. Okay. So your, your at, at the doorway when the first shot was fired, is that correct, and he's in the living room.

"A. In the, the first shot, I think I was probably well, I was would say the living room was about a 15 ft. from the front, okay, from the dining room entrance. He had to be right at that entrance and I was probably about 5 ft from the door and I heard a boom.

. . . .

"Q. Did you hear anyone make a statement prior to that shot being fired?
"A. I didn't hear nothing at that time. I . . .
"Q. Did anyone say anything to the person carrying the pipe?
"A. (Silence) I can't remember whether anything was said or not. At that time I was just like paralyzed.
"Q. Did anyone ever tell the guy to drop the pipe?
"A. Somebody might have said drop the pipe. I mean I can't, I can't say because I was so . . . I can't say when I'm right or wrong you know at that time, cause I don't remember that. The only thing I remember is when that gunshot went off and he was still coming at me with that deal, I'm still backing up.
"Q. Did he say anything to you?
"A. The only thing that I can remember him saying was I'm gonna get ya with this pipe, I'm gonna hit you, tear you up, something similar to that. I can't remember exactly what he might have said and I do remember the last, one of the last things that he did say to me was come on karate man and that was right as we, as I was . . . as he was at the front door I believe that's when he said that and I was out the front door and we went on back a little bit more.
"Q. So you continued to back, you continued to back away from him?
"A. Kept going back from step to step. When he said come on karate man, you know, I had taken karate and everything, and I can defend myself but I was still scared okay, uh had he swung that pipe at me he'd a probably broke my arm and I figured when he said that . . . . When he was younger and fought and everything just like come on karate and then the guys came running to you cause they though well he's just faking and I thought at that point he was going to sling this thing at me. And all of a sudden boom. There was a shot fired and he . . . I didn . . . You know I seen his face at that time cause I had my eyes on his eyes from minute to minute and his hands was straight up and did ta . . . It was only a second before I was moving to the right. I didn't pay no attention to him."

The Court of Appeals also justifies its rejection of Phillips' contention that Larry Marsh's testimony was critical to his defense on the ground that Larry Marsh told police "that the first shot was fired before he had even been threatened by Wilson. This was inconsistent with evidence presented by other witnesses and would have been detrimental to Phillips' theory of defense." Slip op. at 21. We find no statement by Marsh about the first shot being fired before he was threatened. Larry Marsh did tell police that the first

shot was fired before he backed out of the house, and that differs from the testimony of Nicholas Marsh and the Kasinger brothers. But Marsh told police he was backing away from the wrench-wielding Wilson when he heard the first shot.

There were several important things that Larry Marsh's testimony would have added to Phillips' defense. Larry Marsh told police that he was scared and believed he was in danger of suffering great bodily harm. He said he was scared because he knew even his martial arts skills could not prevent him from being seriously injured by a blow from the wrench. Larry Marsh's testimony would have added information that might well have persuaded the fact-finders to believe that Phillips reasonably believed his shooting Wilson was necessary to defend Larry Marsh against Wilson's imminent use of unlawful force. Trial counsel's failure to call Larry Marsh as a witness at trial or even to interview him cannot be explained by trial counsel's expressed preference for cross-examining rather than conducting direct examination of witnesses. Trial counsel's failure to present Larry Marsh's testimony was deficient.

In determining whether Phillips was prejudiced as a result of trial counsel's failing to call Larry Marsh, the court must determine whether its confidence in the trial's outcome has been undermined by counsel's deficient performance. Larry Marsh's testimony would not have been merely cumulative to the eyewitness accounts of James and Michael Kasinger and Nicholas Marsh. Larry Marsh's testimony would have shown his fear of being seriously injured by Wilson and would have supplied the viewpoint of an adult where the other eyewitnesses were quite young. His testimony would have been important in establishing the essential element of reasonable belief in Phillips' defense.

But Larry Marsh's testimony, as important as it might be for establishing the defense of another, would have been considered by the jury along with all the other evidence, including Phillips' failure to tell police that Larry Marsh was being threatened by Wilson. This court must consider the totality of the evidence in weighing an ineffectiveness of counsel claim. *State v. Mathis*, 281 Kan. at 110. Phillips' failure to mention Larry Marsh's peril to police is most troubling and could have convinced the jury to reject

the defense theory at trial. We are not persuaded that Larry Marsh's testimony would have added enough weight to the defense to countervail defendant's own account. Thus, Phillips has failed to show he was prejudiced by trial counsel's failure to call Larry Marsh to testify.

### Trial Attorney's Failure to Call Certain Witnesses

According to the defendant and the Court of Appeals, "[a] recurring theme in the State's prosecution of the case was that Phillips had never attempted to leave the party or contact police in response to Wilson's violent behavior." Phillips contends that trial counsel should have called Farrell Marsh, Vickie Martin, Cheryl Dover, and Melody Grunther to establish that, before shooting Wilson, defendant tried to defuse the hostile situation by calling police and leaving the party. The Court of Appeals concluded that trial counsel's failure to call these witnesses did not rise to the level of ineffective assistance of counsel because none of them could have given testimony that would have been key to Phillips' defense. Slip op. at 15-17.

Even if the test were simply that the witnesses could have furnished testimony that would have aided in Phillips' defense, the only such witness identified by Phillips was Farrell Marsh.

Farrell Marsh testified at the 60-1507 hearing. Farrell testified that he wanted to call police, but, because Wilson was inside the Martins' house, he went in back of the Martins' house to their landlord's house and knocked on the door. While Farrell Marsh was knocking, Phillips showed up. They both knocked, but nobody answered.

Vickie Martin told police that after Wilson was outside beating on Phillips she dialed 911, told the dispatcher what was going on, and gave her address. When Wilson came back in the house, she hung up. Vickie Martin's calling 911 does not help establish that Phillips tried to defuse the hostile situation by calling police or leaving the party. Moreover, other information she gave police was quite detrimental to Phillips' defense. For example, she told police that, after Wilson had fought with James Kasinger and Farrell Marsh, she told Phillips to leave Wilson alone because he was crazy

and Phillips said, "[H]e's not going to be picking on no one around here too much longer [be]cause . . . I've got my gun and I will shoot him." Vickie Martin took Phillips' words seriously enough that she asked Richard Parker to talk to Phillips.

Cheryl Dover told police that Vickie Martin had called 911 before the shooting, but, as noted in the preceding paragraph, Vickie Martin's calling 911 does not help establish that Phillips tried to defuse the hostile situation by calling police or leaving the party. Phillips also contends Dover would have added to the descriptions of Wilson's attack on Phillips that Wilson was choking Phillips. Other witnesses testified that Wilson held Phillips by his hair and punched and kicked him, put him in a headlock, and threatened to break his neck before finally letting him fall down. Slip op. at 3-4. Nicholas Marsh testified, "Brian fell down and everybody thought he was dead at first." Slip op. at 4. Testimony from Dover that Wilson choked Phillips would have added very little to what the jury heard.

Melody Grunther, according to Phillips, "was never contacted by defense counsel even though she was Phillips' girlfriend on the date of the shooting." In fact, Grunther testified at the 60-1507 hearing that on the date of the shooting she and Phillips were friends but did not become boyfriend and girlfriend until approximately 8 months after the shooting. Phillips does not suggest any other reason why defense counsel would have known to contact Grunther, who was not present at the Martins' house the night of the shooting. She testified that Phillips called her at least three times the evening of January 30, 1993, saying he was concerned about the situation at the Martins' house but had no way to leave and asking her to pick him up. Grunther testified, "I informed him that I couldn't do so because of the road conditions. It was very icy that evening, and my parents felt that it wasn't in the best interests for me to go to do that, something could happen along the way." Several things cast some doubt on both the accuracy and the significance of her testimony. First, although Phillips told police he thought about leaving the Martins' house during an interval of calm but did not because Trail's car had broken down, he mentioned nothing to police about telephoning Grunther three times

to come get him. Second, another girl, Cheryl Dover, went to the Martins' house with Phillips the night of the shooting. Third, Phillips was not without some means of transportation away from the Martins' house because Larry Marsh's truck was there and was used by Phillips' friends three times during the evening to go other places. Fourth, icy conditions were not mentioned by trial witnesses, who spoke to police and testified at trial more than 10 years closer to the event than Grunther's testimony. And Larry Marsh was wearing shorts that evening.

Neither Vickie Martin nor Cheryl Dover would have aided Phillips' defense by testifying that he tried to defuse the hostility by calling police or leaving the party. The reason given by Phillips why defense counsel ought to have known to contact Melody Grunther is mistaken, and it is doubtful that her contestable testimony would have aided Phillips' defense.

Of the witnesses identified by Phillips on this issue, only Farrell Marsh might have aided the defense by testifying that Phillips was knocking on the landlord's door. If defense counsel's failing to call Farrell Marsh constituted deficient performance, the second prong of the court's inquiry is whether such failure prejudiced Phillips. To show such prejudice, the defendant must show a reasonable probability that but for counsel's unprofessional errors, the result of the trial would have been different. The probability that evidence of Phillips' knocking on the landlord's door, presumably for the purpose of calling police, would change the outcome of the trial is very slim. "A court hearing an ineffectiveness claim must consider the totality of the evidence before the jury." *State v. Mathis*, 281 Kan. 99, Syl. ¶ 8, 130 P.3d 14 (2006). Here, the jury heard that after knocking on the landlord's door, Phillips went around to the front of the Martins' house, asked James Kasinger for the gun, fired one shot, reloaded and cocked the gun, and then fired the fatal shot. Rather than trying to defuse the situation or avoid being involved in it after knocking on the landlord's door, Phillips reimmersed himself into the situation.

Ralph Martin, according to Phillips, could have established Wilson's mental state and established conclusively that Wilson was swinging the crescent wrench "in the moments before his death."

Wilson's mental state, however, was not in question. It was amply established by the testimony of the young people who observed Wilson's conduct that evening. They all testified that, without provocation, Wilson was aggressive and violent. What Phillips suggests Ralph Martin could have added to this litany of aggressive, violent conduct is that Ralph Martin told police that Wilson was "plum nuts" and "crazy as hell." But the eyewitness accounts of Wilson's words and actions is much stronger evidence of his mental state than Ralph Martin's assessment of it. In any event, Vickie Martin's assessment of Wilson's mental state was in evidence—Marsha Milan testified that Vickie Martin told her to be careful of Wilson because he was crazy, mean, and violent. With regard to Wilson's swinging the crescent wrench, any evidence would have been cumulative to Nicholas Marsh and Michael Kasinger's testimony. But Ralph Martin actually told police Wilson did *not* swing the wrench: "Right, the guy in the white shorts come in through the kitchen, and [Wilson] grabbed the crescent wrench he backed him all the way out the door. *He never swung at him* he done anything, [Wilson] never done anything to him, *he just never swung at him or nothing*, he just backed him out the door." (Emphasis added.)

Richard Parker also, according to Phillips, could have established Wilson's mental state and established conclusively that Wilson was swinging the crescent wrench "in the moments before his death." But, Parker's assessment of Wilson's mental state was much less favorable for Phillips' defense than what was in evidence—Richard Parker told police: "[Wilson's], he's my cousin I love him to death, but he's a little mental ok . . . ." And Parker did not tell police that Wilson was swinging a wrench. Parker, however, did tell police that Phillips and James Kasinger both had pistol-grip shotguns and that Larry Marsh drove up, got out of his vehicle, said, "[D]o it now," and "[s]hots started ringing out." Parker told police that both boys were firing, that they were in the Crips gang, and that he had been talking to them "about this gang mentality bull shit." Trial counsel's failure to call Farrell Marsh, Vickie Martin, Cheryl Dover, or Melody Grunther did not constitute ineffective assistance of counsel.

### Trial Attorney's Failure to Elicit Certain Testimony from Joe Trail on Cross-examination

Phillips contends that trial counsel was ineffective for failing to elicit from Joe Trail the testimony that the witness did not hear Phillips laughing about shooting Wilson. Phillips contends that Trail could have refuted the State's characterization of the defendant as a cold-blooded killer, which Phillips asserts hinged on James Kasinger's testimony that the defendant said he killed Wilson and laughed.

James Kasinger was asked and answered the following questions:

"Q. Now, what happened after you heard that second shot?

"A. After that second shot, I ran. My brother had ran down the street, and I was running behind him. And then Joey was running with us. We ran down the street, and the, umm, I heard a second shot. Brian had come running by, and my brother or—or I asked him, I said, did you shoot him, and he said yes. And, you know—and, like I said, my last statement was for his preliminary hearing, you know, I don't know if he laughed or was laughing at the guy or he was scared laughing. I mean, 'cause when I seen him when we hid the gun, he wasn't, you know, laughing. It wasn't a funny matter.

"Q. In the—in the preliminary hearing, you first testified that he didn't laugh. Do you recall that?

"A. No, 'cause I remember that it was called a nervous laugh.

"Q. You don't remember saying that at the preliminary hearing that he didn't laugh at first and then you change it to a nervous laugh?

"A. I don't remember that, no.

"Q. You did tell the detectives in your taped statement that Brian came by and was laughing. Do you remember that?

"A. I don't—to tell you truth, I don't remember hardly anything that night. Umm, like I said, I had been drinking.

"Q. Well, you've—excuse me. Is what you're testifying, all the stuff that you've told us so far, is that stuff you remember?

"A. Is what I remember but I mean, it's—you know, I can't say it's all clear 'cause, like I said, I was drinking and I was scared that night.

"Q. Okay. So the things that aren't clear are about—one of the things is that Brian told ya 'Let's go get the gun'. That's one of the things that's not clear; is that right?

"A. That's right 'cause he never said that.

"Q. And another thing that's not clear—well, you said that initially though.

"A. Right.

"Q. Okay. And then another thing that's not clear out of all these things that you've testified to is about him laughing or the characterization of that. He did laugh; is that right?

"A. As far as I know, it was —

"Q. How about you made a statement initially that you asked Brian if he was dead and he said yeah, he's dead, something to the effect of that he had shot the motherfucker.

"A. Motherfucker, yes.

"Q. And then laughed. Do you remember saying that?

"A. Then laughed, I don't remember saying that, no.

"Q. Okay. Did he say that: 'I shot the motherfucker'?

"A. Like I said, my—either he said it or somebody else said it.

"Q. Okay.

"A. 'Cause there was four people running down the street at that point. You know, it could have been my brother saying, you know, did you shoot that motherfucker. You know, it could have been that.

"Q. Okay. So—but that's something that you said initially that Brian said 'I shot the motherfucker'.

"A. Yes.

"Q. And then laughed.

"A. Yes."

Michael Kasinger testified: "Well, I started running down the street and my brother starts running with me or either that or he comes a little bit later, and I heard another shot and then I see Brian—Brian comes running down. He's like, I hit him, I hit him. You know, he wasn't joyful or anything. He was scared."

In appellant's brief, he suggests that "[i]n order to reconcile these conflicting accounts, trial counsel should have questioned Joe Trail about the conversation." What Phillips would have had trial counsel elicit from Trail was that he did not hear Phillips say anything about the shooting and did not hear him laugh.

The Court of Appeals stated with regard to this issue: "At the 60-1507 hearing, trial counsel admitted that Trail's testimony on this issue would have been helpful. The district court acknowledged that counsel should have asked Trail about the conversation but concluded that the error did not warrant a new trial." Slip op. at 11. The Court of Appeals agreed with the district court's conclusion: "Trail's testimony would not have directly contradicted [James] Kasinger's testimony; it would only have established that Trail did not hear a statement that Kasinger allegedly heard. While the information might have aided the defense, it is unlikely that

this issue would have made any difference on the outcome of the trial." Slip. op. at 12. We agree.

Although Trail's testimony that he did not hear Phillips laugh or say anything about the shooting would not have "reconciled" the differing accounts of the Kasinger brothers, as Phillips contends, Trail's testimony may have cast some further doubt on the statements to police that James Kasinger already had qualified. The conclusions of the district court and the Court of Appeals with regard to prejudice also appear to be correct. At best, Trail's testimony may have cast some further doubt on the meaning of James Kasinger's initial statements. But it was not established that Trail was close to Phillips from the moment of the shooting on. Thus, if the jurors had heard Trail testify he heard nothing, they might have determined that Trail simply was not present when Phillips laughed and made the remark reported by James Kasinger. In any event, compared to the eyewitness accounts that minimized risk to Larry Marsh and Phillips' failing to tell police that Wilson was threatening Larry Marsh, James Kasinger's qualified statements would have had little or no effect on the jury's decision to reject Phillips' defense.

### Trial Attorney's Failure to Object to the Admission of Certain Evidence

Phillips contends that trial counsel was ineffective for failing to object to evidence that Phillips was on parole at the time of the shooting. The specific question of which Phillips complains is the last question asked by the State before resting its case. In the question, the prosecutor referred to the shotgun: "And one more thing, is it—you were asked about conditions of parole. Is it legal for someone who's on parole or probation to purchase or to have one of these?" Defense counsel asked, "Your Honor, may we approach the bench?" The trial judge denied the request and called for cross-examination. Without objecting, defense counsel began questioning the witness.

Phillips asserts that "[t]he introduction of this prior crimes evidence was the primary claim in Mr. Phillips' direct appeal, but was not considered because of the lack of objection." Examination of

this court's opinion on the direct appeal shows that the prosecutor's question was an issue, though not the "primary claim," and that the merits of the issue in fact were considered. Slip op. at 8-11. On the direct appeal, appellate counsel framed the question as one of admission of prior crimes evidence, which the court noted was within the discretion of the trial court. Slip op. at 9-11. The court found no abuse of discretion. Slip op. at 11. The court also found that the evidence could not have affected the outcome of the trial. Slip op. at 11.

On the direct appeal, the court considered what effect, if any, there was from defense counsel's failure to object and found that, in the circumstances, there was none:

"With regard to not being allowed to approach the bench, Phillips equates refusal of his request to approach the bench with not being allowed to request a contemporaneous admonishment. He asserts that the denial constitutes a due process violation in the courts of this state where defendants are 'penalized' when counsel fail to make a contemporaneous objection. He does not identify the penalty. His argument lacks merit. . . . [I]f the penalty Phillips alludes to is a lowered standard of review, it does not apply to questions of the admissibility of evidence of other crimes. As this court stated in *Nunn*, admissibility of this evidence is in the discretion of the trial court, and an appellate court does not tamper with the trial court's ruling absent an abuse of discretion. 244 Kan. at 210. See K.S.A. 60-261. We find no abuse of discretion." Slip op. at 11.

Phillips also contends that defense counsel was ineffective for failing to object to evidence introduced during James Kasinger's testimony. The first bit of evidence he identifies is this excerpt from James Kasinger's statement to police:

"Q. When we talked with you earlier, we talked about some earlier conversations that you had had with Brian and Brian had made comments to other people about his feelings about guns and killing people. Remember that conversation?
"A. He just told me, and a group of friends, you know, he's not scared to kill nobody."

The second is this statement of Kasinger's during trial, in response to the prosecutor's questioning whether his memory of Phillips' actions was not clearer than his memory of Wilson's actions: "Well, I'm not trying to make Brian the free person. I know what he did was wrong." The third is a reference during trial to Kasinger's statement to police:

"Q. Well, in your—in your statement, you said something about Brian not being afraid to kill someone or something like that. Do you remember that?

"A. I remember that, something like that, yes. But, like I said in my statement, you know, everybody says that—everybody says well, if I had a gun, I'd kill this person, you know. You never know until it comes down to the point, you know.

"Q. Who can kill and who can't; is that right?

"A. Right. Now, I—you know, Brian's not a cold killer."

On this issue, the Court of Appeals stated:

"Phillips also argues that his trial counsel was ineffective for failing to object to Kasinger's testimony that he knew what Phillips had done was wrong and that he previously heard Phillips state that he was not afraid to kill. At the 60-1507 hearing, counsel stated that he chose not to object because he did not want to highlight the statements to the jury. The district court ruled that the failure to object did not cause counsel's representation to be so deficient as to require a new trial.

"In general, Phillips bears the burden of overcoming the presumption that the challenged action was sound trial strategy. See *State v. Rice*, 261 Kan. 567, 599, 932 P.3d 981 (1997) (quoting *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 [1984]). Not highlighting this specific evidence to the jury with an objection could be viewed as sound trial strategy by defense counsel. We agree with the district court that counsel's failure to object to the evidence did not fall below an objective standard of reasonable performance." Slip op. at 10-11.

The Court of Appeals represents that the district court found no deficiency in defense counsel's performance in failing to object to the James Kasinger evidence, but the district court's ruling appears to be a determination that the performance was inadequate but not so prejudicial as to have deprived Phillips of a fair trial. The district court wrote: "Regarding defense counsel's failure to object to James Kasinger's testimony concerning the movant's statements about killing, that testimony was inadmissible; however, the failure to object does not entitle the movant to relief."

The statement and testimony that Phillips said he was not afraid to kill was not hearsay, as Phillips argues, because Phillips was a party to the action. The statement was admissible as an admission by a party under K.S.A. 60-460(g). Thus, defense counsel's performance was not deficient in failing to object to James Kasinger's testimony concerning Phillips' statement.

Defense counsel's failing to object to James Kasinger's nonresponsive answer to the prosecutor's question about his selective

memory constituted deficient performance. Phillips has not shown, however, that it was so prejudicial that the results of the trial would have been different.

### Trial Attorney's Misinforming Phillips That His Criminal Record Would Come into Evidence If He Chose to Testify

In its opinion, the Court of Appeals introduced this issue as follows:

"Phillips argues his trial counsel was ineffective when he advised Phillips not to testify in his own behalf. During the course of the trial, Phillips sought his counsel's advice regarding the decision to testify. Each time Phillips asked about testifying, counsel told Phillips that he did not think it would be a good idea. Counsel was primarily concerned that if Phillips testified, he might say something which could have opened the door to evidence of Phillips' prior criminal record." Slip op. at 12.

According to trial counsel's testimony at the 60-1507 hearing, however, his belief that Phillips would be better off not testifying had a somewhat broader base than the criminal record concern. Trial counsel testified he told Phillips that, if it were him, he probably would not testify on account of the potential for doors to be opened that ought to stay closed. The three doors trial counsel identified were: "Prior criminal record. Propensity for violence. Not telling the truth."

Phillips again contends that trial counsel provided ineffective assistance by misinforming defendant that his criminal record would come into evidence if he testified at trial. With regard to the criminal record matter, the Court of Appeals reasoned as follows:

"A criminal defendant has a constitutional right to testify in his own defense. *Rice*, 261 Kan. at 611. In *Rice*, an out-of-state counsel mistakenly believed that if his client had testified at trial, he would have automatically exposed his previous convictions to the jury. Under the circumstances, the court found the counsel's performance to be ineffective and deficient. 261 Kan. at 607. However, the court found that Rice failed to show prejudice because his testimony would not have contributed to his theory of defense and the fact that he did not testify did not affect the jury's verdict. 261 Kan. at 608. In a dissent, Justice Robert E. Davis stated: 'The defendant was deprived of the "guiding hand of counsel" regarding his right to testify in his own defense. In the absence of adequate advice, he was

in no better position than a defendant deprived of counsel altogether.' 261 Kan. at 613 (Davis, J., dissenting).

"Here, Phillips' trial counsel made it clear to Phillips that whether he testified was ultimately Phillips' decision. The trial judge also made a record to establish that Phillips understood his right to testify. At the 60-1507 hearing, trial counsel testified that he had even prepared a direct examination of Phillips in case Phillips chose to testify.

"This case is distinguishable from *Rice*. In *Rice*, counsel had advised the defendant that if he testified, his prior criminal record would automatically be admissible. Here, trial counsel advised Phillips not to testify because he was concerned that his youthful client would say something which would open the door to the admission of his criminal history. See K.S.A. 60-421. This constituted legally accurate advice and reasonable defense strategy. As long as Phillips knew the decision to testify was ultimately his own, we will not second guess the advice counsel rendered to Phillips concerning this matter." Slip op. at 12-13.

K.S.A. 60-421 provides:

"Evidence of the conviction of a witness for a crime not involving dishonesty or false statement shall be inadmissible for the purpose of impairing his or her credibility. If the witness be the accused in a criminal proceeding, no evidence of his or her conviction of a crime shall be admissible for the sole purpose of impairing his or her credibility unless the witness has first introduced evidence admissible solely for the purpose of supporting his or her credibility."

According to trial counsel, Phillips' criminal record included vehicle theft. Crimes of larceny are crimes involving dishonesty. *Tucker v. Lower*, 200 Kan. 1, Syl. ¶ 3, 434 P.2d 320 (1967). Thus, if defendant had introduced evidence for the purpose of supporting his credibility, evidence of his criminal record might have been admitted. The Court of Appeals correctly concluded that it was legally and strategically sound for trial counsel, as long as the ultimate decision was made by the defendant, to suggest that his client would be better off not testifying than risking the introduction of his criminal record.

In addition to the specific complaints addressed in the preceding issues, Phillips contends that trial counsel was generally ineffective and identifies the following deficiencies in support of his contention: (1) failing to file a motion to suppress Phillips' statements to police; (2) failing to object to evidence of witness tampering; (3) failing to object to evidence that Phillips had not expressed remorse in his conversations with police officers; (4) failing to object during

closing statement to the prosecuting attorney's questioning the truthfulness of Phillips' friends; and (5) failing to advise the trial judge of sleeping jurors. The Court of Appeals declined to address the issue:

"Phillips has lumped these arguments into one section of his brief, claiming that his counsel was 'generally ineffective' based on the evidence. Phillips provides almost no legal authority to support his contention. An issue which is incidentally raised on appeal need not be considered by an appellate court. See *State v. Hunt*, 275 Kan. 811, 821, 69 P.3d 571 (2003); *State v. Seck*, 274 Kan. 961, 965, 58 P.3d 730 (2002). Without further elaboration, we simply conclude that the district court's findings and conclusions regarding this claim were supported by substantial evidence in the record." Slip op. at 22.

In his petition for review, Phillips does not mention that the Court of Appeals declined to address the issue.

The Court of Appeals' declining to analyze Phillips' contentions was reasonable. There is very little information, few record references, and only one relevant citation in this section of Phillips' brief. (The other citations are to cases involving cumulative *trial* errors rather than the totality-of-the-circumstances analysis of an ineffective assistance of counsel claim.) The Court of Appeals has declined to consider issues only "incidentally mentioned" in several other cases that were criminal or arising out of criminal prosecutions. See *State v. Marshall*, 21 Kan. App. 2d 332, 335, 899 P.2d 1068 (1995); *Douglas v. State*, No. 92,706, unpublished opinion filed August 26, 2005. The Court of Appeals did not err in refusing to consider the issues incidentally raised by Phillips.

Phillips' final argument is that the trial court violated Phillips' right to due process by failing to make findings of fact and conclusions of law on the issues raised in his 60-1507 motion.

The Court of Appeals disagreed:

"Whether the district court complied with Rule 183(j) involves a question of law. An appellate court has unlimited review over questions of law. See *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991).

"In reviewing a ruling on a motion for postconviction relief, the appellate court must look to the district court's expressions of its findings and conclusions in the journal entry and to its oral expressions at the time of the hearing. If taken together, they meet requirements of Rule 183(j), then remand is not required. *Harris v. State*, 31 Kan. App. 2d 237, 238, 62 P.3d 672 (2003).

"Phillips' motion included numerous issues which required the district court's attention. As the district court announced its ruling, the court asked trial counsel to help ensure that all issues presented had been addressed. At the conclusion of the ruling, counsel indicated there were no further issues in need of attention. Defense counsel never objected to the sufficiency of the district court's findings.

"Generally, a litigant must object to inadequate findings of fact and conclusions of law to give the district court the opportunity to correct them, and in the absence of an objection, omissions in findings will not be considered on appeal. *Gilkey v. State*, 31 Kan. App. 2d 77, 77-78, 60 P.3d 351, *rev. denied* 275 Kan. 963 (2003). Where no objection is made, this court will presume the district court found all facts necessary to support its judgment. However, this court may still consider a remand if the lack of specific findings precludes meaningful review. 31 Kan. App. 2d at 78.

"Here, a review of the oral findings as well as the journal entry indicate that the district court sufficiently considered the issues presented. The district court provided a thorough journal entry which is adequate for meaningful appellate review." Slip op. at 6-7.

In his petition for review, Phillips merely reiterates his assertion that the court failed to comply with Rule 183(j) (2005 Kan. Ct. R. Annot. 228). He does not address the Court of Appeals' discussion of his failure to object to the sufficiency of the district court's findings of fact and conclusions of law. We agree with the Court of Appeals' analysis of this issue, and we find no merit in Phillips' argument that his right to due process was violated.

Affirmed.

DAVIS, J., dissenting: I respectfully dissent from the majority opinion and would, as explained below, reverse defendant's conviction and remand for a new trial based upon the inadequacy of counsel in failing to call Larry Marsh to testify. The majority opinion concludes that this failure to present Larry Marsh's testimony was deficient but not prejudicial under the two-prong test set forth in *State v. Mathis*, 281 Kan. 99, 109-10, 130 P.3d 14 (2006).

In my opinion, application of this two-prong test requires reversal of the defendant's conviction and a remand for a new trial. The majority opinion provides an excellent analysis of the reason why the failure to call Larry Marsh to testify was deficient on the part of defense counsel. However, the majority, in considering the totality of evidence and, most importantly, defendant's failure to

mention Larry Marsh's peril to police immediately following the shooting, demonstrates that the prejudice prong of *Mathis* was not satisfied. In other words, the majority concluded that the defendant had failed to show he was prejudiced by trial counsel's failure to call Larry Marsh to testify.

I respectfully disagree. In my opinion, the failure to call Larry Marsh, the only witness supporting one of the primary defenses of the defendant, the defense of another, is sufficient to undermine confidence in the outcome of this trial. Notwithstanding the fact that the defendant did not mention Larry Marsh to the police after the shooting, the defendant could have explained this numerous ways. The absence of the jury hearing directly from Larry Marsh that he was threatened by the victim and the victim was capable of inflicting great bodily harm or death upon him by reason of his distance from the victim undermines the jury verdict. I am unable to predict that such evidence would have no effect on the jury verdict in this case. In my opinion, there exists a reasonable probability the result may have been different had the jury considered the testimony of Larry Marsh. I would therefore reverse and remand for a new trial.

LUCKERT, J., joins in the foregoing dissenting opinion.