(948 P.2d 1135)
No. 75,563

STATE OF KANSAS, *Appellee*, v. RANDALL C. SANFORD, *Appellant.*

Opinion filed May 30, 1997.

*Jessica R. Kunen*, chief appellate defender, for appellant.

*Jerome A. Gorman*, assistant district attorney, *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before ELLIOTT, P.J., GERNON and MARQUARDT, JJ.

MARQUARDT, J.: Randall C. Sanford appeals his convictions by a jury of two counts of aggravated robbery and two counts of kidnapping.

On July 26, 1994, at 11:40 p.m., two armed men, wearing dark-colored pantyhose over their heads, dark clothing, and gloves, entered the Coachlite, a bar in Kansas City, Kansas. The two men told Vesta Martin, the bartender, and Roger Pape, a customer, that it was a holdup and ordered them to get down on the floor. One of the robbers told Martin to take the money from the cash register, which was approximately $1,000 in bills and rolled quarters, and to put it into a white bag.

The other robber ordered Pape to empty his billfold. After one of the robbers ripped out the telephone lines, Martin and Pape were ordered into the men's restroom and told to get on the floor and not to come out for 10 minutes or the robbers would "blow [their] heads off."

About an hour after the robbery, Officer Danny Ruth of the North Kansas City, Missouri, police department observed the vehicle that Sanford was driving go over a curb while turning into a parking lot. Officer Ruth pulled in behind Sanford's vehicle just as the occupants were exiting—Sanford from the driver's seat, Anthony Pica from the front passenger seat, and Kim Sanford, Sanford's wife, from the back seat. Sanford was arrested for driving under the influence and taken to jail. Although the vehicle was registered to Kim, the dispatcher notified Officer Ruth that the license plate on the car was listed as stolen. The vehicle was then towed.

During an inventory search of the vehicle, a white bag containing approximately $1,000 in bills and quarters was found under the front passenger seat along with a .357 magnum. A flashlight, half a pair of dark-colored pantyhose, a pair of gloves, and two short-sleeved shirts were found on the back seat. Another pair of gloves was later found in the vehicle.

Pica and Kim were also taken into custody by the police. At the time that Sanford posted bond and was released, the Missouri police were not aware of the robbery. Upon his release, Sanford left the state and was later arrested in Minnesota. Kim was released on the same day that she was arrested, but Pica remained in police custody and was eventually convicted of carrying a concealed weapon.

Rita Sanford, Sanford's sister-in-law, reported to the Missouri police that her husband's gun was missing. The gun that was found in Sanford's vehicle was later identified as the missing weapon. According to Sanford's brother, both Pica and Sanford knew about and had access to the gun.

At trial, Pica testified against Sanford. Pica and Sanford had known each other for about 25 years. Pica's testimony about the robbery was similar to that given by the two victims, except that Pica testified that Sanford was the only one with a gun. Pica testified that after the robbery, he and Sanford went out behind the bar to Kim's car, where she was waiting. After putting the money and gun into the car, Pica and Sanford drove around, drinking and talking, until Sanford's car went over a curb and they were stopped by the police. Pica testified that he had put his own gloves in the car, but that Sanford's gloves and pantyhose were "gone."

Pica served 6 months in the Clay County jail on the concealed weapon charge before being transported back to Wyandotte County to face the charges in this case. Pica and Sanford were then placed together in the same cell. Sanford typed a letter for Pica to sign, which stated that Sanford had nothing to do with the robbery. Pica testified that Sanford had him sign the letter in front of a notary.

Shirley Ann Campbell Brown, a night bartender at the Mill Street Tavern, and Mary Sue Emily, her friend, were at the Mill Street Tavern on the evening of the robbery. Emily testified that she had seen Sanford with Kim and Pica at the tavern that evening and that Sanford, Kim, and Pica left together around 8:30 p.m.

Brown testified that although she knew Sanford as a customer, she did not know him personally. Brown saw Sanford come into

the tavern between 8 and 8:30 p.m. and then leave with Kim and Pica about 10 minutes later.

Outside the presence of the jury, Sanford stated at trial that he was knowingly waiving his right to testify. The defense then rested without presenting any evidence.

On March 29, 1995, a jury found Sanford guilty on all counts as charged. Sanford then filed a motion for judgment of acquittal or, in the alternative, a new trial on the basis of various trial errors, including those raised on appeal. Sanford was appointed new counsel after his trial counsel, Max Goracke, withdrew due to Sanford's claim of ineffective assistance of counsel. Sanford's new counsel then filed an additional motion for a new trial or judgment of acquittal. A hearing was held on the motions, and they were denied. Sanford was sentenced to a controlling prison term of 206 months.

Sanford appeals, claiming that the prosecutor made improper remarks during voir dire and in closing argument, that there was insufficient evidence to convict him, that testimony about his federal warrant should not have been allowed, that the jury instruction on the burden of proof was erroneous, and that he had ineffective assistance of counsel.

Sanford bases his claim of ineffective assistance of counsel on Goracke: (1) advising Sanford not to testify; (2) filing a notice of alibi and then failing to withdraw it prior to trial after deciding not to develop an alibi argument; (3) not cross-examining Pica as to whether he feared Sanford; (4) misstating the evidence during closing argument; (5) failing to bring to the trial court's attention a letter that was written by Sanford in which he requested different counsel; and (6) failing to contact any of Sanford's named alibi witnesses.

Although we find that Goracke's failure to contact Sanford's named alibi witnesses constitutes ineffective assistance of counsel, we do not find merit in any of the other issues raised.

Kansas courts follow a two-pronged test in evaluating claims of ineffective assistance of counsel:

" 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Sec-

ond, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " *Taylor v. State*, 252 Kan. 98, 103, 843 P.2d 682 (1992).

The inquiry under the first prong is whether counsel's assistance was reasonable under all the circumstances. See *State v. Rice*, 261 Kan. 567, Syl. ¶ 14, 932 P.2d 981 (1997). "Judicial scrutiny of counsel's performance must be highly deferential, and . . . every effort [should] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 261 Kan. 567, Syl. ¶ 14. A defendant must overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. 261 Kan. 567, Syl. ¶ 14. Under the second prong, a defendant must show that a reasonable probability exists that the result of the proceedings would have been different if not for counsel's errors. 261 Kan. 567, Syl. ¶ 15. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." 261 Kan. 567, Syl. ¶ 15.

An "appellate court is to review de novo the trial court's analysis of the performance and prejudice components, which are mixed questions of law and fact." *Rice*, 261 Kan. 567, Syl. ¶ 16.

We find no reversible error in Goracke's failure to withdraw the notice of alibi, in his advising Sanford not to testify, in his cross-examination of Pica, and in his statements during closing argument.

However, Goracke's failure to contact the alibi witnesses, whose names Sanford had given him, is another matter. Goracke testified that based on conversations that he had regarding the alibi claim with Sanford, Kim, and Dallas Wolfe of the Mill Street Tavern, he decided not to put on any alibi witnesses. Goracke testified further that Kim had originally told him that she and Sanford left the Mill Street Tavern at 11 p.m. After Goracke informed Kim that this testimony would not provide Sanford with an alibi, Kim changed her testimony. Although Goracke believed Kim to be his key witness, he thought that she would perjure herself if called to testify. The other alibi witnesses were all friends, acquaintances, or relatives of Pica. Goracke stated that he did not see any reason to

contact these individuals because he believed that they would be hostile witnesses and to have them testify could easily backfire.

Goracke attempted to call some of the other alibi witnesses, but was only able to contact Wolfe, who told him that no one at the tavern would help. Goracke testified that he did not see any reason to continue his search for alibi witnesses because it would only be a waste of resources. Sanford testified that Goracke told him that he would hire an investigator to find the alibi witnesses, but that he never did. Goracke admitted that he and Sanford had discussed hiring an investigator, but he did not recall telling Sanford that he would hire one.

It is not improper for an attorney to refuse to use a supporting witness when the attorney believes that the witness will either commit perjury or be hostile. Here, Goracke did not question the potential witnesses to determine whether they were hostile to his client or whether they could provide an alibi. Although many of the witnesses were friends, acquaintances, or relatives of Pica, they were also friends, acquaintances, and relatives of Sanford and might not have been hostile.

Choices made by counsel after a less than complete investigation can be reasonable, but only to the extent that the decision to limit or forego certain investigation is reasonable under the circumstances. *Strickland v. Washington*, 466 U.S. 668, 690-91, 80 L. Ed. 2d 674, 104 S. Ct. 2052, *reh. denied* 467 U.S. 1267 (1984). Sanford and his wife claimed to have been with several people during the evening of the robbery. Although these witnesses might have provided an alibi, Goracke made only a perfunctory attempt to contact them.

Goracke's decision not to investigate further, either personally or through a hired investigator, was not reasonable under the circumstances. See *Bryant v. Scott*, 28 F.3d 1411, 1416-19 (5th Cir. 1994); *Sullivan v. Fairman*, 819 F.2d 1382, 1391-92 (7th Cir. 1987).

We must then decide whether Goracke's failure to investigate prejudiced Sanford by determining whether the testimony Sanford could have presented created error so serious as to deprive him of a fair trial.

At the post-trial motion hearing, Kim testified that on July 26, Sanford and his daughter picked her up from work at 5 p.m., they stopped to get something to eat, and then they went over to the Mill Street Tavern. Kim and Sanford dropped Sanford's daughter off at home sometime before 7 p.m. and then went back to Kim's house so that she could change before they went to a birthday celebration. When Kim and Sanford could not find the house where the birthday party was being held, they went back to the Mill Street Tavern at around 9:15 p.m., where they met up with the people from the birthday party. Kim, Sanford, and their friends all played pool and darts until almost midnight, at which time they all decided to go to another bar. Just as everyone was leaving, Pica came into the tavern. Pica, his sister, and another friend rode with Kim and Sanford in Kim's car to the next bar. Kim testified that she had left her car unlocked while she was at the Mill Street Tavern. Kim, Sanford, and Pica decided to go to yet another bar located in North Kansas City, Missouri. Right after Sanford pulled into the parking lot of the last bar, he was detained by the police.

In addition to Kim's testimony, Sanford offered the testimony of three other individuals regarding his alibi, although two of the three were not much help. Jimmy Covington, Sr., testified that his wife, Pica, Kim, Sanford, and Dianne Watson all got together on July 26 for his birthday. Covington was not able to recall the events of July 26 or when things occurred because he was drunk by 3 or 4 o'clock in the afternoon and did not sober up until the next morning. Lorena Pica, Pica's sister-in-law and Sanford's sister, testified that in August 1995, she was part of a three-way telephone conversation with Sanford and Covington. During that conversation, Sanford kept asking Covington if he remembered certain events, and Covington kept saying that he could not remember.

Dianne Watson testified that early in the day on July 26, she, Sanford, Sanford's daughter, and the Covingtons sat outside the Mill Street Tavern waiting for it to be opened up by Wolfe so that they could go inside and celebrate Jimmy Covington's birthday. While it was still daylight, Sanford left the tavern with Kim and his daughter and later returned with just Kim. Sanford was with Watson, Kim, and the Covingtons the rest of the evening until they left

to go to another bar, the Quarry, sometime between midnight and 12:30 a.m. Pica arrived at the tavern just about the time the party was leaving and decided to ride with Sanford and Kim to the Quarry. The entire group arrived at the Quarry sometime between 12:30 and 1:00 a.m. Shortly thereafter, Pica, Kim, and Sanford left the Quarry together.

Based on Watson's testimony, Sanford and Kim were at the Mill Street Tavern at the time that the robbery occurred, but Pica was somewhere else until at least 15 minutes after the robbery had occurred. Watson was a close friend of Pica's sister and she did not know Sanford very well; thus, she would have little reason to lie. On the other hand, during the first part of her testimony, Watson stated that she had consumed a beer every 20 to 30 minutes and that nobody was watching the time that day. It is possible that cross-examination on these points might have damaged Watson's credibility.

Nevertheless, if Goracke had combined Watson's testimony with Kim's, he could have provided an explanation as to: Sanford's whereabouts that evening, placing Sanford at the tavern at the time of the robbery; the presence of the stolen license plate on the car; the incriminating items that were found in the car, which were the strongest physical evidence of Sanford's guilt; and how Pica could have had access to Kim's car, placing the items there unnoticed. Thereafter, the jury might have been more inclined to focus on the weaknesses in the State's case, which were: the lack of an explanation as to the whereabouts of the second gun and pantyhose; Pica's insistence that there was only one gun despite the victims' assertions that each robber had a gun; and the discrepancies in the testimony of Brown, Emily, and Pica regarding the time Sanford left the Mill Street Tavern.

Although it is a close call, we believe that the testimony of Kim and Watson could have created a reasonable doubt for the jury. Defense counsel's failure to make more than perfunctory attempts to contact alibi witnesses and to investigate further, either personally or through a hired investigator, was not reasonable under the facts presented. Therefore, Sanford's convictions are reversed, and the case is remanded for a new trial.

Because the case is being remanded, we will not address the other issues raised on appeal.

Reversed and remanded.