(293 P.3d 772)
No. 107,248

RUSSELL LEE SHUMWAY, *Appellant*, v. STATE OF KANSAS, *Appellee.*

Opinion filed January 18, 2013.

*Debra J. Wilson,* capital and conflicts appellate defender, of Capital Appeals and Conflicts Office, for appellant.

*Jodi Litfin,* assistant district attorney, *Chadwick J. Taylor,* district attorney, and *Derek Schmidt,* attorney general, for appellee.

Before GREEN, P.J., MARQUARDT, J., and BRAZIL, S.J.

GREEN, J.: Following a trial by jury, Russell Lee Shumway was convicted of intentional second-degree murder and attempted theft and sentenced to 620 months' imprisonment. His convictions

were later affirmed by this court on direct appeal. *State v. Shumway*, 30 Kan. App. 2d 836, 50 P.3d 89, *rev. denied* 274 Kan. 1117 (2002).

Shumway filed a habeas corpus motion under K.S.A. 60-1507 alleging that he was denied effective assistance of counsel when trial counsel failed to call two alibi witnesses. Later, Shumway filed an amended habeas corpus motion under K.S.A. 60-1507 maintaining that he was denied effective assistance of counsel because his trial counsel failed to call several witnesses who would have supported his defense theory. The trial court dismissed Shumway's motions without an evidentiary hearing. On appeal, this court reversed the trial court's decision and remanded to the trial court with directions to grant Shumway an evidentiary hearing on his first claim (included in the original, timely filed habeas corpus motion) and to determine whether Shumway's remaining claims (brought in the amended habeas corpus motion) should be considered to prevent manifest injustice. See *Shumway v. State*, No. 102,027, 2010 WL 1462712 (Kan. App. 2010) (unpublished opinion). After an evidentiary hearing, the trial court denied both motions.

Shumway's principal argument on appeal is that his trial counsel's performance—in failing to call two alibi witnesses, in failing to call a witness who would have contradicted the testimony of the State's two principal witnesses, and in failing to call two witnesses who would have supported his defense theory—was not only deficient but also prejudicial to his defense, which deprived him of a fair trial. Thus, Shumway contends that the trial court erred (1) when it concluded that Shumway's trial counsel's decision not to call two alibi witnesses was reasonable trial strategy and (2) when it concluded that Shumway's remaining ineffective assistance of counsel claims should be dismissed because Shumway had failed to show manifest injustice. Finding merit in Shumway's first and second arguments, we reverse his convictions and remand for a new trial.

### The Death of Mitchell Davis

Mitchell Davis was found dead in the backyard of his home around noon on October 7, 1999. The cause of death was blunt force trauma to the head; his injuries were consistent with having been struck with a two-by-four board. Davis' blood was found on a two-by-four board in the alley near his home, hidden under a bush. No fingerprints were found on the board.

The coroner could not establish a time of death. Two neighbors of Davis saw him alive with a young woman the evening of October 6, between 11 p.m. and 11:30 p.m. One neighbor identified the woman as "Angie." Another person saw Davis on his front porch around midnight.

It was determined that Davis was under the influence of methamphetamine when he died. He had both amphetamine and methamphetamine in his system, and he had a syringe in his pocket.

### The Case Against Russell Shumway

John Finney alleged that he saw Shumway kill Davis. He testified that on the evening of October 6, 1999, at about 10:30 p.m., he and Shumway left their residence to walk to North Topeka. After walking about 10 minutes, and traveling two to three blocks, they found themselves in the alley behind Davis' residence. They saw some bicycles in Davis' backyard and decided to steal them. When Finney discovered that the bicycles were chained, he suggested that they leave. After Finney walked out into the alley, he heard a moan from the backyard. He looked over the fence and saw Shumway hitting Davis with a board. Finney ran back to their residence. It took him 4 to 5 minutes to run this distance. His wife, Mary Finney, Shumway's wife, Catherine Dennis, her daughter, Angela Dennis, and Angela's two small children were there when he arrived. He told the three women that he thought Shumway had killed someone.

John Finney testified that Shumway told him that he took some cash and credit cards out of Davis' pocket and hid them under a bush in the alley about a block from Davis' residence along with the two-by-four board. Nevertheless, no cash or credit cards were found with the board.

In testifying against Shumway, John Finney was able to avoid 6 months in jail. Finney's criminal record indicated that he had been convicted of theft and forgery involving false statements or dishonesty. Finney admitted that the police had supplied him with details regarding this crime: that Davis had been hit in the head with a two-by-four board and that the two-by-four board was found under a bush in the alley. The police also showed him a picture of the backyard, a picture of the bicycles behind the house, and other pictures and diagrams of the crime scene.

Mary Finney testified that her husband and Shumway left the residence before 11 p.m. and returned a half hour to an hour later. She alleged that her husband came home and told them that Shumway had killed someone. When Shumway returned home, there was blood on his shirt and shorts. Shumway warned John Finney not tell anyone what he had seen.

Like her husband, Mary Finney had been convicted of forgeries and thefts involving dishonesty and false statements. She and her husband discussed the evidence that the police had showed him before she spoke to the police. She was on probation and had two pending criminal cases when she testified against Shumway at his preliminary hearing.

Vickie Thomas testified that the weekend after Davis' death, she accused Shumway in front of his wife Catherine Dennis of having killed Davis. She alleged that Shumway admitted striking Davis and that Catherine Dennis heard his admission.

The other witnesses against Shumway were jailhouse informants. Ed Radford had previous convictions for theft, forgery, and bad checks involving dishonesty or false statements. He testified that Shumway had made a jailhouse confession to him that he killed Davis.

Another jailhouse informant, John L. Powers, Sr., urged the State to use him as a witness instead of Ed Radford. Powers maintained that Radford got his information by reading Shumway's paperwork. Powers also had convictions for thefts, forgery, and bad checks involving dishonesty and false statements.

The final jailhouse informant, Russell Lutz, testified that he was friends with Shumway and that Shumway told him that he hit Davis

too hard. In exchange for Lutz' testimony, the State amended his charge from aggravated burglary to attempted aggravated burglary and dismissed other counts.

*The Case Against Troy Love*

The defense theory of the case was that Davis was killed by a drug dealer named Troy Love in a dispute over drugs or drug money. Shane Lynn testified that when the police first arrived to investigate Davis' death, people in the community believed that Love had killed Davis. Lynn told one of the investigating officers that he believed that Love killed Davis over drug money.

Defense witness Stephanie Markham, one of Davis' neighbors, testified that she saw Davis around 1 a.m., on October 6, 1999, the day before his body was found. She described him as very nervous. Davis told her that he had been pulled over by the police. Moreover, he told Markham that he had a large quantity of drugs in his possession, which he had received from Love. He told her that he threw the drugs out of the car window when the police approached him.

Markham further testified that around noon on October 6, 1999, Love came to Davis' home, looking for him, but Davis was not home. Markham told Davis about Love's visit when he returned home. Markham described Davis as nervous and anxious that day; he was carrying a gun in the back of his pants.

Topeka Police Officer Bruce Voigt, of the narcotics unit, confirmed that he had stopped Davis on October 5, 1999, for a defective tail light. Officer Voigt believed that Love was selling methamphetamine from a residence in the area, and he thought that Davis had come from this residence. He questioned Davis about Love and his activities related to methamphetamine, and he received some information from Davis. He asked Davis to make a controlled buy from Love. But he did not arrest Davis. Although Officer Voigt testified that he did not see Davis throw anything from his car, he stated that it was possible that Davis threw something from the car.

During the trial, the State requested an instruction on second-degree murder as a lesser included offense of first-degree felony

murder, which the court granted. The jury found Shumway guilty of murder in the second degree and attempted misdemeanor theft.

Our court affirmed Shumway's convictions on direct appeal. See *Shumway*, 30 Kan. App. 2d 836. On January 10, 2003, Shumway moved for a new trial. He alleged that he had newly discovered evidence. Shumway's motion for a new trial was denied, and that decision was later affirmed by our court. See *State v. Shumway*, No. 92,871, 2005 WL 2495794 (Kan. App. 2005) (unpublished opinion).

*Shumway's Habeas Corpus Motion under K.S.A. 60-1507*

On September 23, 2003, Shumway filed a 60-1507 motion in which he alleged, in part, that he was denied effective assistance of trial counsel when his counsel failed to call two alibi witnesses. On August 9, 2005, Shumway filed an amended 60-1507 motion arguing, in part, that he was denied effective assistance of trial counsel because his counsel failed to call several witnesses who would have supported his theory of defense. The trial court dismissed Shumway's 60-1507 motion without holding an evidentiary hearing. After the trial court summarily dismissed Shumway's 60-1507 motion, our court reversed and remanded to the trial court with directions to grant Shumway an evidentiary hearing on his alibi witness claims and to determine if Shumway's untimely ineffective assistance of counsel claims should be addressed to prevent manifest injustice. *Shumway v. State*, No. 102,027, 2010 WL 1462712 (Kan. App. 2010) (unpublished opinion).

Ryan Kipling Elliot and Julia Spainhour were the attorneys who represented Shumway at trial. Both testified at Shumway's 60-1507 hearing. Shumway, along with several of the witnesses who he believed should have been called at trial, also testified. In its memorandum decision, the trial court denied Shumway's timely filed K.S.A. 60-1507 claims and dismissed his amended K.S.A. 60-1507 claims as untimely. Specifically, the trial court concluded the following: (1) that Shumway had "failed to prove that his trial counsel acted unreasonably when they decided not to call Catherine Dennis and Angela Dennis as potential alibi witnesses"; and (2) that Shumway's "alleged lack of access to his discovery as an excuse for

his untimely filing of his amendments to his petition [was] not credible and does not constitute a basis for finding manifest injustice."

Although the trial court dismissed Shumway's untimely claims, it went ahead and addressed the merits of those allegations. In particular, the trial court concluded that Shumway's attorneys were not ineffective for failing to call certain witnesses because the witnesses' testimony was cumulative and their failure to call the witnesses did not constitute manifest injustice.

*Did the Trial Court Properly Conclude that Shumway's Trial Counsel's Decision to Dismiss Catherine and Angela Dennis as Alibi Witnesses Was Reasonable Trial Strategy, Thereby Precluding Relief under Shumway's K.S.A. 60-1507 Motion?*

Shumway first argues that his defense attorneys were ineffective because they failed to call Catherine Dennis and Angela Dennis as alibi witnesses. The State disagrees and maintains that the trial court correctly found that Shumway's defense attorneys were not ineffective for failing to call Davis' alibi witnesses because their decision was reasonable trial strategy.

When the trial court has conducted an evidentiary hearing, appellate courts review the denial of a 60-1507 motion to determine if the trial court's factual findings are supported by substantial competent evidence and are sufficient to support its conclusions of law. *Bledsoe v. State*, 283 Kan. 81, 88, 150 P.3d 868 (2007). Substantial evidence is legal and relevant evidence that a reasonable person might view as sufficient to support a conclusion, and appellate courts have unlimited review of conclusions of law. *State v. Walker*, 283 Kan. 587, 594-95, 153 P.3d 1257 (2007); see *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 915-16, 157 P.3d 1109 (2007). An appellate court cannot weigh conflicting evidence, evaluate the credibility of witnesses, or redetermine questions of fact. *In re Estate of Hjersted*, 285 Kan. 559, 571, 175 P.3d 810 (2008). "Ultimately, the district court's conclusions of law and its decision to grant or deny the 60-1507 motion are reviewed using a de novo standard." *Bellamy v. State*, 285 Kan. 346, 354-55, 172 P.3d 10 (2007).

An allegation of ineffective assistance of counsel presents mixed questions of fact and law requiring de novo review. To establish ineffective assistance of counsel, a defendant must establish the following under the totality of evidence before the jury: (1) that counsel's performance was deficient because counsel made errors so serious that his or her performance was less than that guaranteed by the Sixth Amendment to the Constitution of the United States; and (2) that counsel's deficient performance prejudiced the defense because his or her errors deprived the defendant of a fair trial. *Bledsoe*, 283 Kan. at 90-91.

In other words, defense counsel is ineffective if his or her efforts were objectively unreasonable as measured against prevailing professional norms and if counsel's errors were prejudicial. *Strickland v. Washington*, 466 U.S. 668, 688-94, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Prejudice equates to a probability sufficient to undermine confidence in the outcome; a reasonable probability that the proceedings would have produced a different result if not for counsel's deficient performance. *Phillips v. State*, 282 Kan. 154, 159-60, 144 P.3d 48 (2006). Moreover, under allegations of ineffective assistance of counsel, judicial scrutiny of counsel's performance is highly deferential, and a strong presumption exists that counsel's conduct is reasonable. 282 Kan. at 159-60.

At the K.S.A. 60-1507 hearing, the trial court concluded that defense counsel's actions in not calling Catherine Dennis and Angela Dennis as alibi witnesses were a matter of trial strategy. In discussing trial strategy, our Supreme Court explained that strategic decisions made by trial counsel based on a thorough investigation are virtually unchallengeable:

"Trial counsel has the responsibility for making tactical and strategic decisions including the determination of which witnesses will testify. Even though experienced attorneys might disagree on the best tactics or strategy, deliberate decisions based on strategy may not establish ineffective assistance of counsel. Strategic choices based on a thorough investigation of the law and facts are virtually unchallengeable." *Flynn v. State*, 281 Kan. 1154, Syl. ¶ 5, 136 P.3d 909 (2006).

Nevertheless, defense counsel may not "disregard pursuing a line of investigation and call it 'trial strategy.' " *State v. James*, 31 Kan. App. 2d 548, 554, 67 P.3d 857, *rev. denied* 276 Kan. 972 (2003).

"[W]hen counsel lacks the information to make an informed decision due to inadequacies of his or her investigation, any argument of 'trial strategy' is inappropriate." *Mullins v. State*, 30 Kan. App. 2d 711, 716-17, 46 P.3d 1222, *rev. denied* 274 Kan. 1113 (2002) (citing *Clay v. State*, 954 S.W.2d 344, 349 [Mo. App. 1997]). Upon review, "[s]trategic choices based on less than a complete investigation are reasonable to the extent that reasonable professional judgment supports the limitation on the investigation. [Citation omitted.]" *Flynn*, 281 Kan. at 1157.

Here, Shumway maintains that Elliot, his defense counsel, was ineffective because he dismissed his alibi witnesses, Catherine Dennis and Angela Dennis. Specifically, Shumway contends that Elliot's decision to dismiss the Dennises as witnesses was unreasonable because his choice "was hasty and unreasonable, in light of the fact that the witnesses had attended numerous meetings, had cooperated with his pretrial efforts and were present in order to support the defense he had prepared."

At the K.S.A. 60-1507 evidentiary hearing, Elliot testified that he received his license to practice law in Kansas in 1997. In the year 2000, Elliot was an attorney at the Northeast Kansas Conflicts Office. That same year, Elliot and Spainhour were appointed to represent Shumway. Elliot testified that although part of their trial strategy was to show that Troy Love committed the crime, their primary defense strategy was a "theory of innocence," *i.e.*, that Shumway did not commit the crime. Under this strategy, Elliot maintained that his primary focus was to show that the State's key witness, John Finney, was not credible. Specifically, Elliot noted that John Finney had prior convictions for crimes involving dishonesty or false statements and was testifying in exchange for a favorable deal from the State in his own case. Elliot also testified that John Finney's interaction with the officers during the investigation, which he described as "police misconduct," would show that John Finney's testimony was not credible.

As for his failure to call Catherine Dennis and Angela Dennis as alibi witnesses, Elliot testified that although he had filed a notice of alibi for them, he had not made a firm decision to use them as witnesses. Elliot explained that he was concerned with Catherine's

and Angela's potential testimony for several reasons, including the following: (1) Catherine and Angela failed to show up to a meeting he had scheduled with them for 7 a.m. the morning of the trial; (2) Catherine's statements concerning her potential testimony "were not overly consistent," which made him unsure about what her testimony would be, and Catherine could have been under the influence or tired the day she was supposed to testify because she was "acting kind of strange"; (3) Angela was believed to have been involved in a romantic relationship with her uncle John Finney, the State's key witness; and (4) Angela seemed "aloof and not engaged" on the day that she was supposed to testify.

Elliot went on to explain that he believed the State's evidence was weak. Moreover, he believed that he and Spainhour had been able to show the flaws in the State's case on cross-examination. In other words, Elliot believed that Catherine Dennis' and Angela Dennis' questionable credibility could have hurt Shumway's case if he had put them on the stand.

The State argues that Elliot's alleged ineffectiveness was simply an appropriate exercise of professional judgment because he investigated the potential alibi defense but ultimately decided to reject it. The State's argument has merit. As mentioned earlier, "[s]trategic choices based on a thorough investigation of the law and facts are virtually unchallengeable." *Flynn*, 281 Kan. 1154, Syl. ¶ 5. Here, Shumway does not maintain that Elliot failed to complete a thorough investigation for his potential alibi defense, which generally has been a ground for establishing ineffective assistance of counsel. See, *e.g.*, *State v. Sanford*, 24 Kan. App. 2d 518, 522-23, 948 P.2d 1135, *rev. denied* 262 Kan. 967 (1997) (defendant received ineffective assistance of counsel when his attorney failed to investigate or contact alibi witnesses); *State v. James*, 31 Kan. App. 2d 548, 553-55, 67 P.3d 857 (2003) (attorney demonstrated ineffective assistance of counsel when he failed to contact or subpoena defendant's alibi witnesses); see also *State v. Thomas*, 26 Kan. App. 2d 728, 731-32, 993 P.2d 1249 (1999), *aff'd* 270 Kan. 17, 11 P.3d 1171 (2000) (defendant received ineffective assistance of counsel when his attorney failed to file a notice of alibi but

unsuccessfully tried to establish an alibi defense through witness who had not been properly and timely endorsed).

Nevertheless, a strong argument can be made that Elliot's decision not to call either Catherine Dennis or Angela Dennis or both cannot be approved as a matter of trial strategy. In stating that an alibi is able to establish a defendant's innocence, our Supreme Court declared: "An alibi places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for the accused to be the guilty party. [Citations omitted.]" *State v. Pham*, 234 Kan. 649, 656, 675 P.2d 848 (1984); see K.S.A. 22-3218.

Elliot testified that there had been some concerns raised about using Angela Dennis as a witness because he had heard that Angela might have been in a "boyfriend/girlfriend" relationship with her uncle by marriage, John Finney. Moreover, Angela seemed "somewhat aloof" that day. He feared that if he put Angela on the witness stand, she would recant everything that she had previously told them. He agreed, however, that despite her bad relationship with Shumway, and despite the fact that she was warned she might lose her child should she fail to cooperate with the police, she alibied Shumway when she spoke to Detective Kenneth Eaton. Despite the fact that she had a bad relationship with Shumway, she came to Elliot's office to discuss the case with him and appeared in court on the day that she was to testify. Moreover, Angela did not tell Elliot, the day of trial, she would not testify to the alibi; she did not tell him that she was going to recant. Elliot could not recall if he asked her those questions. Elliot testified that he did not believe that the State had presented strong evidence, and because of this, he believed both Angela Dennis and Catherine Dennis would have hurt their defense.

Regarding Catherine, Elliot testified that she seemed tired that morning. Moreover, he was concerned about her ability to stick with her statement through cross-examination.

We are aware of the old adage that a bad witness does more harm to a cause than many good ones can repair. Nevertheless, Elliot had no other witnesses who could establish Shumway's innocence. Even if Elliot considered Angela Dennis and Catherine

Dennis were bad witnesses, they were the only witnesses who could possibly show that Shumway did not kill Davis. For example, Angela Dennis testified at the evidentiary hearing that Shumway was at home on the night of Davis' murder. Angela further explained that the house where they lived was very small. The house had one door, which opened into the area where Angela stayed with her two young children. Because of this arrangement, Angela stated that when she was home, no one could leave the house without being either seen or heard by her. Angela relayed this information to Detective Eaton when she was interviewed by police. In addition, Angela's testimony would have contradicted John Finney's testimony because she stated that she did not see John Finney or Mary Finney the night of Davis' death. Moreover, she never heard Shumway state that he had hurt Davis, and she never saw or heard John Finney accuse Shumway of hurting Davis. Angela further explained that if Elliot had called her as a witness, her testimony would have been consistent with the statement she gave Detective Eaton.

Because Catherine died before the evidentiary hearing, we do not have the benefit of her testimony.

When attorneys must rely on the testimony of a bad witness, they will gather every piece of corroborating testimony they can and combine it where it will best support the weak witness. If there are some corroborating circumstances, the task of supporting the weak witness is far from hopeless. Here, the defense had another witness who could have corroborated the testimony of Angela Dennis and Catherine Dennis. This witness, who we will discuss in detail later, stated that she was with Davis at his home until 1 or 2 a.m. on October 7, 1999. Moreover, this was a disinterested witness who had no motive to fabricate her testimony.

But, as discussed later, Elliot did not call this disinterested witness to testify during the trial. Thus, if the jury believed this disinterested witness, along with Angela or Catherine or both, as discussed in the next paragraph, Shumway could not have killed Davis when John Finney alleged that he saw Shumway beating Davis. Importantly, during the evidentiary hearing, Elliot conceded that without the testimony of Angela Dennis and Catherine Dennis, he

did not have any equivalent evidence to counter the testimony of John and Mary Finney.

In this case, the timing of Davis' beating was of critical importance to Shumway. The State, through the testimony of John and Mary Finney, attempted to show that Davis was beaten between 10:30 p.m. and midnight on October 6, 1999. Admittedly, Elliot was aware that the State would attempt to establish that time frame based on the testimony of John and Mary Finney. Thus, the time when Davis was beaten was a critical factor in determining Shumway's innocence or guilt. To illustrate, one question the jury would have wanted to have answered is: Could Shumway have been there when Davis was beaten to death? If Shumway could not have been there when Davis was beaten to death, Shumway was not guilty. Elliot had no witnesses who could establish that Shumway was not there when Davis was beaten to death except Angela Dennis and Catherine Dennis. Elliot testified that their primary defense strategy was a "theory of innocence": that Shumway did not commit the crime. As stated earlier, an alibi is an innocence theory of defense. Moreover, the time frame between 10:30 p.m. and midnight on October 6, 1999, was critical to Shumway's "theory of innocence" because he had an alibi for this period of time. Based on the "theory of innocence" defense, trial counsel was ineffective for failing to call either Angela Dennis or Catherine Dennis or both as an alibi witness.

Because trial counsel's failure to call either Angela Dennis or Catherine Dennis or both as an alibi witness is so closely interwoven with the next two issues, we will delay addressing the prejudice prong of the *Strickland* test until the last issue.

*Did the Trial Court Err When It Found that Shumway's Remaining Claims Did Not Have to Be Considered Because They Were Untimely?*

Next, Shumway argues that the trial court erred when it found that his amended 60-1507 motion was untimely and that manifest injustice did not exist to extend the 1-year time limitation of K.S.A. 60-1507(f)(1). The State, however, argues that Shumway's remain-

ing claims were time barred because he "should have included [them] in his first [1507] petition."

K.S.A. 60-1507(f)(1) provides that a 60-1507 motion must be filed within 1 year of the following time frame: the final order of the appellate court in the direct appeal; the denial of a petition for writ of certiorari; or the final order of the United States Supreme Court. Because the 1-year time limit under K.S.A. 60-1507(f)(1) did not become effective until July 1, 2003, a defendant whose conviction became final before the effective date of this statute had until June 30, 2004, to file a timely K.S.A. 60-1507 motion. See *Hayes v. State*, 34 Kan. App. 2d 157, 161-62, 115 P.3d 162 (2005).

In this case, Shumway's convictions became final on September, 24, 2002, when our Supreme Court denied his petition for review. See *State v. Shumway*, 30 Kan. App. 2d 836, 50 P.3d 89, *rev. denied* 274 Kan. 1117 (2002). Shumway filed his original 60-1507 motion on September 23, 2003, which was within the 1-year time limitation of K.S.A. 60-1507(f)(1). Shumway did not file his amended 60-1507 motion until August 9, 2005, which was well past the 1-year time limitation under K.S.A. 60-1507.

In *Pabst v. State*, 287 Kan. 1, Syl. ¶ 7, 192 P.3d 630 (2008), our Supreme Court held that an amendment to a K.S.A. 60-1507 motion "that asserts a new ground for relief which is supported by facts that differ in both time and type from those grounds set forth in the original motion does not relate back to the date of the original motion, so as to circumvent the 1-year limitation of K.S.A. 60-1507(f)(1)." In other words, if an amended 60-1507 and original 60-1507 motion are related to the same general conduct, transaction and occurrence, then there is nothing barring the amended 60-1507 from relating back to the original 60-1507 motion. In reaffirming its holding in *Pabst*, our Supreme Court in *Thompson v. State*, 293 Kan. 704, 714, 270 P.3d 1089 (2011), stated the following:

"If an amendment to a K.S.A. 60-1507 motion is permitted, the timeliness of amended claims is subject to the *Pabst* time and type test enunciated in K.S.A. 60-215(c), *i.e.*, relation back is permitted only if the new claims arose 'out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.' "

Neither Shumway nor the State has graced us with an argument concerning the relation back test. The trial court held that Shumway's claims under his amended K.S.A. 60-1507 motion were untimely. The court found that Shumway's excuse for his untimely filing of those claims was inadequate. Thus, the failure of his trial counsel to call certain witnesses in support of his theory of defense did not constitute manifest injustice.

The 1-year time limitation of K.S.A. 60-1507(f)(1) for bringing an action may be extended by the trial court only to prevent a manifest injustice. K.S.A. 60-1507(f)(2). "Manifest injustice" has been interpreted to mean " 'obviously unfair' " or " 'shocking to the conscience.' [Citations omitted.]" *Ludlow v. State*, 37 Kan. App. 2d 676, 686, 157 P.3d 631 (2007). Moreover, the State argues that Shumway has not demonstrated manifest injustice that would allow for the extension of the 1-year time limitation of K.S.A. 60-1507(f).

Nevertheless, because the parties and the trial court have failed to consider the relation back test under *Pabst*, this court is tasked with the following question: Were any of Shumway's amended claims under his amended K.S.A. 60-1507 motion related to the same general conduct, transaction, or occurrence set forth or attempted to be set forth in Shumway's original K.S.A. 60-1507 motion to avoid the bar of the 1-year time limitation under K.S.A. 60-1507(f)(1)?

As discussed earlier, Shumway's original 60-1507 motion alleged, in part, that he was denied effective assistance of trial counsel when his counsel failed to call Angela Dennis and Catherine Dennis as alibi witnesses. He maintained that this adversely affected his "theory of innocence" defense. Likewise, Shumway, under his amended 60-1507 motion, argued, in part, that he was denied effective assistance of counsel because his trial counsel failed to call several witnesses who allegedly would have supported his theory of defense. Shumway, in his K.S.A. 60-1507 original motion, contended that his trial counsel was ineffective for failing to call certain witnesses who would have supported his theory of defense. Thus, the amended motion and the original motion are related to the same general conduct, transaction, and occurrence which involved

Shumway's claim of ineffective assistance of trial counsel. There is nothing to bar these amended claims from relating back to Shumway's original K.S.A. 60-1507 motion. See *Walker v. State*, No. 101,431, 2012 WL 686685 (Kan. App. 2012) (unpublished opinion) (Because the amended motion and the original motion were related to the same general conduct, transaction, and occurrence which involved movant's claim of ineffective assistance of trial and appellate counsel, there was nothing to bar this amended claim from relating back to movant's original K.S.A. 60-1507 motion.). As a result, the trial court erred when it held that Shumway's amended claims were untimely.

*Did the Trial Court Err in Finding that Shumway's Trial Counsel Was Not Ineffective for Failing to Call Several Witnesses at Trial?*

Although the trial court ruled that the claims from Shumway's amended 60-1507 motion were time-barred, it, however, addressed the merits of those claims. On appeal, Shumway maintains that the trial court erred in finding that his counsel was not ineffective for failing to call several witness—Angela Kendall, Lori Treiber, and John Funk—at trial. The State disagrees and maintains that the trial court's finding was correct because the testimony of those witnesses would have been cumulative.

We have previously set out the standards for a trial court's denial of a K.S.A. 60-1507 motion when it has conducted an evidentiary hearing and for an allegation of ineffective assistance of counsel, so we will not repeat them here.

The duty of counsel to make reasonable investigations has been set forth in *State v. Hedges*, 269 Kan. 895, 914, 8 P.3d 1259 (2000), as follows:

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. [Citations omitted.]"

A. *Testimony of Angela Kendall*

Shumway first argues that "the district court erred in its legal conclusion that Angela Kendall's testimony was cumulative." Ken-

dall testified at the 60-1507 evidentiary hearing. At the hearing, Kendall testified that she had been at Davis' house on October 6, 1999. Specifically, Kendall stated that she arrived at Davis' house between approximately 10 and 11 p.m. and stayed until 1 or 2 a.m. Kendall explained that she went to Davis' house to pick up some methamphetamine, but the drug dealer never arrived with this drug. Kendall's testimony at the hearing, however, differed from the information that she gave police shortly after Davis' murder.

According to Kendall's written police statement, she told police that she left Davis' house around midnight. Shumway argued that his trial counsel should have called Kendall as a witness because her testimony would have contradicted John and Mary Finney's testimony that Davis' murder occurred between 10:30 p.m. and midnight.

In evaluating the merits of Shumway's claim, the trial court found that Kendall's testimony was cumulative. In particular, the trial court stated:

"In examining the testimony of Ms. Kendall, it is noted that her testimony would have been on the same subject matter as other witnesses who testified at trial. Stephanie Markam, Shane Lynn and Piper McPherron all testified that they had seen Mitch Davis alive at some point in the timeframe in which the State alleged Mr. Davis was murdered. The Court is not convinced that defense counsel's performance was prejudicially deficient in deciding not to call an additional witness for the purpose of pointing out that Mr. Davis was seen alive at the time when the principal accuser alleged the crime was committed. The testimony of Ms. Kendall would have been cumulative."

Nevertheless, Kendall's testimony was not cumulative to the testimony of Markham, Lynn, and Piper McPherron. Instead, their testimony corroborated Kendall's account, lending it credibility. For example, Markham, Lynn, and McPherron all testified that they saw Davis alive on October 6, 1999. Markham testified that "Angie" (presumably Angela Kendall) arrived at Davis' house at about 10:30 and that she saw Kendall and Davis sitting in the front room of his house at about 11 or 11:30. Lynn testified that he saw Davis sitting on his front porch at around midnight. Finally, McPherron testified that she saw Davis sitting on the front porch

with a girl at about 11:30 p.m. Thus, these witnesses would have corroborated Kendall's account.

Moreover, although these witnesses testified that they saw Davis alive at or before midnight, none of them testified that they had seen him alive between 1 a.m. and 2 a.m. Nor did they testify that they were with Davis at his home between 1 a.m. and 2 a.m. Kendall's testimony would have extended the time frame that Davis was alive while directly contradicting John and Mary Finney's testimony that Davis was killed sometime between 10:30 p.m. and midnight. According to John Finney, he and Shumway left their residence around 10:30 p.m., and it took them about 10 minutes to arrive at Davis' home. Shumway allegedly attacked Davis a short time later (probably before 11 p.m.). Mary Finney testified that Shumway and her husband left their home before 11 p.m. and returned a half hour, to an hour later. As stated earlier, Kendall testified that she had been at Davis' home the evening of October 6, 1999, arriving between 10 and 11 p.m. and leaving between 1 or 2 a.m. She testified that no one attacked or beat Davis while she was there. Davis was fine when she left; he walked her to her car. She saw the crime scene tape around Davis' house the next day and learned the police were looking for her.

Kendall went to the police department and spoke with a detective. She gave him a statement regarding her contact with Davis the night before his body was found. She agreed with the detective's report stating that she told him that she was at Davis' home until midnight or 12:15 a.m. She believed at the time that she was "the number one suspect" so she may have told the police that she left earlier than she actually did, because she did not want them to think she was there at 2 a.m.

Kendall further explained she did not leave Davis' home until 1 or 2 a.m. because she was waiting for a delivery of methamphetamine, which never arrived. She was sure she stayed until at least 1 a.m. because "an addict will wait on dope forever . . . . So I find it hard to believe and I got there at 11:00 and left at midnight, because that's only an hour of waiting." Kendall testified that she was never contacted by anyone from the defense team, and she was not called as a witness at trial. Kendall also testified that she did

not know Shumway in October 1999, or when she gave the police her statement in this case.

Elliot testified that he was aware of Kendall's statement and knew that the police believed that Davis had been killed during the time period between 10 p.m. and midnight. Elliot agreed that if Kendall testified consistently with her statement to Detective Eaton, she would have directly contradicted John and Mary Finney's testimony and that it would have been beneficial to Shumway's defense. He was sure that the defense team had considered using her as a witness, but he could not recall why they did not. He could not recall interviewing her and could not recall any strategic or tactical reason for not calling her.

Spainhour also saw the report regarding Kendall's statement. She stated that she was certain they considered using her as a witness, but she did not know why they did not interview her. She could recall no strategic reason for not investigating the possibility of calling her as a witness.

The decision of whether to call a particular witness is a matter of trial strategy. See *Winter v. State*, 210 Kan. 597, Syl. ¶ 2, 502 P.2d 733 (1972). "On the other hand, defense counsel cannot make a strategic decision against pursuing a line of investigation when he or she has not yet obtained facts upon which that decision could be made. [Citation omitted.]" *Mullins v. State*, 30 Kan. App. 2d 711, 716, 46 P.3d 1222, *rev. denied* 274 Kan. 1113 (2002). When counsel does not have the information to make an informed decision due to an inadequate investigation, any argument of "trial strategy" is improper. 30 Kan. App. 2d at 716-17; see, *e.g.*, *State v. James*, 31 Kan. App. 2d 548, 553-55, 67 P.3d 857 (2003) (attorney demonstrated ineffective assistance of counsel when he failed to contact or subpoena defendant's alibi witnesses); *State v. Sanford*, 24 Kan. App. 2d 518, 522-23, 948 P.2d 1135, *rev. denied* 262 Kan. 967 (1997) (defendant received ineffective assistance of counsel when his attorney failed to investigate or contact alibi witnesses).

Although both trial counsel testified that there must have been some strategic reason for failing to interview Kendall, or use her as a witness, neither lawyer could recall a reason. They had both

been made aware of the nature of Shumway's claim and had been offered access to their trial materials, and thus had the opportunity to review their records and discover the reason, if there was one, for failing to interview Kendall or use her as a witness.

Had counsel interviewed Kendall, they would have learned the importance of her testimony in light of the time line sworn to by John and Mary Finney. They would have realized she was at Davis' home longer than the written report indicated. The trial court excused this failure to pursue a line of defense on the grounds that her testimony would have been cumulative. But none of the witnesses who testified at trial stated that they were with or observed Davis during *and beyond* the entire time period during which John Finney contended that Shumway had attacked Davis.

B. *Testimony of Lori Treiber and John Funk*

Finally, Shumway maintains that Elliot was ineffective for failing to call Lori Treiber and John Funk as witnesses. Both Treiber and Funk testified at the 60-1507 evidentiary hearing. Treiber testified that she knew Davis based on their involvement with methamphetamine. Treiber explained that on October 5, 1999, she went to Davis' house to complete a drug sale with Davis and Troy Love. Treiber had agreed to sell Love $600 worth of methamphetamine. Although Love only had $500 on him, Treiber completed the sale because Davis agreed to pay her the remaining $100 by 10 a.m. the next day.

When Davis failed to pay Treiber the $100 as agreed, Treiber spent the day (October 6, 1999) looking for Davis, but she could not find him. That evening, Love met with Treiber between 8 and 9 p.m. Love was upset because he believed that he had been shorted on the methamphetamine sale. Treiber replied that she had been shorted $100. Love stated that he had given the money to Davis, but Treiber told him she had not received it. Love paid Treiber another $100.

Love called Davis about the drug sale. Love believed that he had not only been shorted, but also had to pay twice for methamphetamine that he never received. Treiber testified that as Love spoke to Davis on the phone, he became very angry. After Love

ended his phone conversation with Davis, he told Treiber that "if she had anything to do with [Davis, she] better take care of it that night . . . 'because *there wasn't going to be a [Davis] tomorrow.'* " (Emphasis added.) Shortly after Davis' body was found, Treiber told the police about those events during a videotaped interview. Treiber testified that she had no other involvement in the case and that she was not contacted by defense counsel.

Funk testified at the evidentiary hearing that Davis was a friend whom he had known for several years. Funk explained that Davis was afraid of Love. Funk further testified that within a few days of Davis' death, he saw Davis and Love talking outside Davis' house. When Love left, Davis asked Funk to help him to obtain some guns from the house of Davis' father. Funk reluctantly agreed, and the two went to Davis' father's house and stole the guns. Funk testified that Davis got the guns, in part, because of his fear of Love. Funk stated that he told this information to the defense investigator with whom he spoke, but he was not asked to testify on Shumway's behalf.

When Elliot was questioned about his failure to call Treiber as a witness, he stated that he could not remember if he had interviewed Treiber. Elliot went on to add that he would have no reason to dispute Treiber's testimony that she was not contacted by the defense. In downplaying the importance of Treiber's testimony to Shumway's theory of defense, Elliot stated:

"You know, all I—again, you know, this has been ten years ago. And a lot of things that you think about, and strategy-wise, are not pieces of paper. And if I remember correctly, and I have not reread the entire transcript of the trial, but I seem to remember, I mean, when we—when Troy Love came up, Troy Love's name comes up in a lot of cases. And, you know, our basic strategy was that [Shumway] did not do this and that [the State] did not have the evidence to show that he did, and yes, there was possibly somebody else that might have done it or had a reason to, and again, without re-reading the transcript, it seems to me that what we, [Spainhour] and I, decided, was that we're not going to hang our cases on Troy Love, that he did this. You know, we thought we had stronger stuff, let me throw his name out. His name did get thrown out. Let the jury bite onto that if they want to. We were not going to put all our eggs in that basket, because it didn't make sense to us."

Similar to Elliot, Spainhour testified that the defense team had received a copy of Treiber's police report and videotaped interview,

but she did not remember watching the videotape before trial. When asked if the defense had considered calling Treiber as a witness, she said, "I don't recall discussing Miss Treiber at all."

As for the failure to call Funk, Elliot testified that he could not remember if he contacted him and could not remember anything else about him. Elliot agreed that Funk's testimony would have been consistent with the theory that Love killed Davis. Spainhour also testified that Funk's testimony would have been consistent with the theory that Love killed Davis. Spainhour testified that she could not remember if they had investigated using Funk as a witness, and she could not remember anything else about Funk.

In evaluating the merits of Shumway's claim, the trial court found that Treiber and Funk's testimony was cumulative. In considering Treiber's testimony, the trial court declared:

"While the specific wording and intent of Mr. Love's purported statement can be debated, and while the parties can also debate whether such statement would be inadmissible hearsay or would have required the availability of Mr. Love as a witness, it does not appear that Ms. Treiber could offer any evidence that pointed to Mr. Love actually acting on the purported threat. The evidence that Troy Love possibly had a motive to kill Mr. Davis was planted in the minds of the jury through witnesses, Mr. Lynn, Ms. Markham and Officer Voight. The Court is not convinced that the failure to call Ms. Treiber as an additional witness would have likely resulted in a different trial outcome because the motive of Mr. Love to harm Mr. Davis was placed before the jury by other witnesses. It is noted further that apparently the police considered but dismissed Troy Love as a potential suspect during the investigation."

In considering Funk's testimony, the trial court stated:

"The testimony that could have been offered by Mr. Funk was covered by Stephanie Markham's testimony. She testified that Mr. Davis was anxious and carrying a weapon. The Court is not persuaded that the failure of defense counsel to call Mr. Funk as an additional witness constituted deficient performance or caused Mr. Shumway any prejudice. The testimony would have been cumulative."

Funk's testimony, although somewhat cumulative to the neighbor's testimony, would have provided further support for the defense position that Davis was fearful of Love in the days preceding his death. Nevertheless, Treiber's testimony was not cumulative. No other witness, as Shumway points out, testified that Love was angry with Davis, testified Love was convinced Davis had cheated

him on a drug deal, or most importantly, had made a prediction—that came true—that Davis would be dead by the next day: "there ain't gonna be a tomorrow for Mitch."

Neither Elliot nor Spainhour gave a reason as to why they failed to call Funk as a witness, and neither could remember if they investigated using Funk as a witness. As mentioned earlier, failure to complete a thorough investigation has been a ground for establishing ineffective assistance of counsel. See, *e.g.*, *State v. Sanford*, 24 Kan. App. 2d 518, 522-23, 948 P.2d 1135, *rev. denied* 262 Kan. 967 (1997). Elliot's and Spainhour's inability to remember if they investigated Funk supports Shumway's claim that he received ineffective assistance of counsel.

A similar analysis applies to Treiber's testimony. Elliot could not remember if he interviewed Treiber, and Spainhour could not remember discussing Treiber, at all. Although Shane Lynn allegedly told police that he thought Love had killed Davis over drugs, there was no evidence presented similar to Treiber's potential testimony. Treiber's testimony was essential to Shumway's defense because it established a strong motive for Love to have committed the crime. Treiber's testimony would have shown that Love was angry at Davis because of the bad drug deal.

Certainly, Treiber's testimony would have helped the defense show that Shumway did not commit the crime. Contrary to the trial court's assertion, Treiber did not have to show that Love actually acted on his threat. Treiber's testimony merely had to plant reasonable doubt in the minds of the jurors, *i.e.*, it had to show that Love, instead of Shumway, could have committed the crime. Thus, Elliot's failure to call Treiber as a witness was unreasonable, which satisfies the first prong under *Strickland*. See 466 U.S. at 688-94.

*Prejudice*

Under the second prong of the ineffective assistance of counsel analysis, Shumway must show that there is a reasonable probability that the proceeding would have produced a different result if not for Elliot's deficient performance. See *Phillips*, 282 Kan. 154, Syl. ¶ 2.

As discussed earlier, Angela Kendall's testimony would have contradicted the accounts, sworn to under oath, of John and Mary Finney. Moreover, John and Mary Finney learned details of the crime from police, testified for benefits, and their claims were not corroborated by any physical evidence linking Shumway to the crime or the crime scene. Trial counsel offered no tactical reason for failing to interview Kendall or use her as a witness. Counsel's failure to investigate a disinterested witness, with no reason to lie for Shumway, who would have testified that the victim was with her, alive and well, both during and well past the time John Finney claimed that Davis was beaten to death by Shumway, was unreasonable. This satisfies the first prong of *Strickland*.

Next, we must determine whether there was a reasonable probability that, but for trial counsel's errors, the result of the trial would have been different. In this case, the time when Davis was beaten to death was a critical factor in determining Shumway's innocence or guilt. Earlier we discussed trial counsel's failure to call either Angela Dennis or Catherine Dennis as an alibi witness. The testimony of either Angela or Catherine might have established Shumway's alibi to Davis' murder and would have further eroded the credibility of John and Mary Finney.

Moreover, if Davis had been killed before midnight, according to John Finney's testimony, the testimony of Angela Kendall that she was with Davis until 1 a.m. to 2 a.m. would have shown that Davis was not killed when John Finney claimed. As a result, Kendall's testimony would have furnished Shumway with a defense to Davis' murder. Also, Kendall's testimony would have corroborated the alibi testimony of Angela Dennis and Catherine Dennis.

Finally Treiber's testimony that Love had threatened Davis' life just hours before he was found murdered would have furnished strong support to Shumway's "theory of innocence," that Love was Davis' killer. Because Treiber's evidence, standing alone, could have caused reasonable doubt in the minds of the jurors, the failure to present this evidence was prejudicial to Shumway's theory of defense.

The inconsistent statements and credibility problems of the State's key witnesses coupled with the possible favorable testimony

from uncalled witnesses would have cast doubt on the State's case. Furthermore, there was no physical evidence: no fingerprints, no fibers, no blood, tying Shumway to this crime. As a result, we determine that the trial counsel's deficient performance prejudiced the defense so as to deprive Shumway of a fair trial.

Reversed and remanded for a new trial.