NOT DESIGNATED FOR PUBLICATION

No. 118,112

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ANTHONY RUCKER,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; BILL KLAPPER, judge. Opinion filed July 20, 2018. Reversed and remanded.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Adam Sokoloff*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., PIERRON and MALONE, JJ.

PER CURIAM: Anthony Rucker appeals the district court's summary denial of his K.S.A. 60-1507 motion in which he asserted that his trial counsel provided constitutionally deficient representation. Rucker argues that he asserted sufficient facts to warrant an evidentiary hearing on his claims. Alternatively, he argues that even without a hearing, the record conclusively shows that he received ineffective assistance of counsel, requiring the reversal of his convictions and a new trial. We agree with Rucker's first argument and remand for an evidentiary hearing because the motion, files, and records of the case do not conclusively show that Rucker is entitled to no relief.

1

FACTUAL AND PROCEDURAL BACKGROUND

The facts of the underlying case are summarized in *State v. Rucker*, No. 109,678, 2014 WL 4231234 (Kan. App. 2014) (unpublished opinion):

"Bradley Willis owned a rental property located at 4511 Rowland Avenue in Kansas City, Kansas, which he rented to members of Rucker's family for approximately 2 1/2 years. During the Rucker family's tenancy, Willis became familiar with Rucker because, as landlord, he went to the property at least once a month to collect the rent and/or to perform repairs and Rucker was present during several of these visits.

"In approximately December 2010, Marsha Rucker, Rucker's mother, notified Willis that the family planned to vacate the property and would need a couple of weeks to move their belongings. Marsha updated Willis as to the status of the move-out on several occasions. On January 6, 2011, she called Willis to confirm that they had officially vacated the property. Consequently, later that day, Willis went to the rental house with his brother, Jake Willis, and Jake's best friend, Zachary Langston, to do any cleaning or repairs that were necessary to put the property back on the rental market. They began cleaning the house, and while they were doing so, they left the front door and garage door open.

"Willis testified that after approximately 30 minutes, while he was working in the garage, Rucker arrived at the property in 'an '86, '87 green [Chevy] pickup, long bed, single cab,' driven by 'another guy.' Rucker told Willis that he was 'going to need [to grab] some things,' and Willis told him that he could take whatever he wanted because he had planned to throw away the items the Rucker family left behind. According to Willis, Rucker then looked around in the garage and went through the living room and kitchen area. But after 'kind of just pac[ing] through the house and never grabb[ing] anything,' Rucker 'started getting kind of mad' for no apparent reason. When asked at trial what Rucker was talking about when he became agitated, Willis stated, 'Just wanting things, and I told him he could have things and he was just kind of mumbling on about—just like pissed off in a way. . . . I really don't know why he was mad, to tell you the truth.' Due to Rucker's erratic behavior, Willis asked him to step outside because his little brother was there and Rucker was 'cursing a lot.'

"Once outside, Rucker and Willis continued to exchange words. Rucker led Willis to believe that he wanted a 'wheel or something' that was in the trash truck. When

2

Willis told him he could have it, Rucker's anger only escalated and he started screaming obscenities at Willis. Rucker told Willis that he was 'going to come back and Glock up the place or glack up the place,' a statement which Willis understood to mean that Rucker planned to come back to the house and shoot them. Willis could not think of any reason for Rucker all of a sudden to get excited and make such a threat because he had already told Rucker he could take whatever items he wanted from the property. Consequently, Willis took Rucker's threat seriously and he immediately telephoned 911. Willis described Rucker's demeanor during this call, 'Just felt threatened in a way, so I just called just to—just to get a cop there just in case.' Rucker left the scene.

"Jake was cleaning inside the house and heard his brother and Rucker engaging in a heated conversation both inside and then outside the house. He stated, 'I heard just more cussing and some yelling, and then I heard [Rucker state,] "I'm going to come back and gat this place up," and the exact words of my brother, "[D]o what you got to do, I'm going to call the cops."' Jake interpreted the phrase 'gat this place up' to mean '[c]ome back and shoot the place, shoot whoever's there,' and he believed the word 'gat' was slang for 'Gatlin.'

"Langston was also cleaning inside the house and heard an argument between Willis and an individual whose appearance was 'very similar' to that of Rucker. He later heard the individual state, "'I'm going to gack the place up"' and, in response, Willis threatened to call the police. Similar to Willis and Jake, Langston understood the phrase 'gack the place up' to mean that the individual planned to 'come back and shoot the place up.'

"After Rucker left the scene, Willis started cleaning the front yard. Approximately 5 minutes later, Willis saw a car turn down the street. As it slowly approached the house, Willis heard gunshots coming from the vehicle. Willis looked up at the car and noticed that it was a 'small [or midsized] compact car, four door' and darker in color. According to Willis, a black male was driving the car and Rucker was seated in the middle of the backseat and had some sort of pistol in his hands. Willis considered Rucker to be easily identifiable because he was 'about six foot, 3 hundred some pounds.'

"According to Willis, Rucker kept the gun inside the car and fired it through the backseat window, which was rolled halfway down. Jake and Langston were cleaning the front bedroom when Rucker fired the gun at the residence. Jake heard 'loud bangs' coming from the street and he realized the bangs were gunfire when he saw a sheet covering one of the windows move and Langston fall to the ground with a bullet wound.

3

After Langston 'bounced once and then got back up,' Jake carried him into the far back bedroom, where the two of them took cover on the floor until the shooting ceased. According to Jake, Langston looked terrified, he could not move at all, he was groaning very loudly, and he could not put a sentence together, i.e., he could only 'put out a couple words at a time.'

"Willis testified that after Rucker fired a couple times at the house, Rucker noticed that he was in the front yard. Rucker pointed the gun directly at Willis and began shooting in his direction. Willis ran towards the garage and dove inside. When the car left the scene, Willis screamed for Jake and Langston, and upon discovering that a bullet had hit Langston, Willis called 911 for the second time that day. Unlike his first call to 911, Willis described his demeanor as 'pretty frantic' because he 'couldn't believe that Rucker came back and shot over pretty much nothing.'

"According to Dr. Charlie Richart, M.D., an attending physician in trauma and surgical critical care at the KU Medical Center, Langston arrived at the hospital by ambulance in critical condition. The bullet had entered Langston's right chest and exited through his back. When the trauma team opened Langston's chest, they discovered his liver was in his chest because the bullet had destroyed his diaphragm, the muscle that separates the abdomen from the chest and allows one to breathe. Langston also had two lacerations on his right lung that were actively bleeding, two ribs were 'pretty well destroyed' by the bullet, and the arteries that run with the ribs were also bleeding. Langston remained hospitalized for approximately 2 weeks. He testified he has lasting effects from his injuries including shrapnel in his right chest, a hard time breathing, and difficulty sleeping due to nightmares.

"Brian Christian, a detective with the Kansas City, Kansas Police Department, interviewed Rucker on November 2, 2011. After advising Rucker of his *Miranda* rights, he asked Rucker if he was familiar with the residence located at 4511 Rowland. Rucker replied he was because some of his family members lived there and, although he did not personally live there, he used that address to receive his food stamp assistance from the State of Kansas. Rucker acknowledged he had gone to the residence on January 6, 2011. Detective Christian testified that Rucker provided the following description of the events that transpired while he was there:

"'[Rucker] advised that he had got a ride from a friend, and he couldn't remember his name. They arrived in a green pickup truck. He got out of the truck and stood on the side of the truck and had some words with the landlord, Bradley Willis. He advised that

4

he did not leave the side of the truck and that he couldn't remember what the words that were exchanged between him and Bradley Willis at the time, so once he figured his people weren't there he got back in the vehicle and left the area.'

"When asked if, based upon his training, knowledge, and experience, he knew what the word 'Glock' referred to, Detective Christian replied that this term referred to a weapon, specifically, a handgun. Detective Christian further explained he interpreted the word 'gat' as slang for the word 'shoot.'

"At his jury trial, Rucker waived his right to testify and called one witness to testify on his behalf, Etoyce Fantroy. Fantroy testified that on January 6, 2011, he lived at his parents' residence located at 4517 Rowland Avenue, the residence neighboring Willis' rental property, and although he did not know Rucker personally, he had seen him next door. Fantroy testified that on January 6, he saw Rucker and another individual 'basically getting into a[n] argument next door.' According to Fantroy, shortly after Rucker left the scene, a 'rustic-type gold vehicle' pulled in front of the house and a gunman, perched in the backseat of the vehicle, fired several rounds at the house.

"Fantroy maintained he got a good look at the shooter and it was not Rucker. Fantroy testified the perpetrator was a guy a little bit bigger than him with light skin and long, shoulder-length hair. During his cross-examination, Fantroy admitted he was on probation for aggravated battery and possession of phencyclidine and other minor violations. He further acknowledged that law enforcement had spoken with him at his residence twice following the shooting.

"The State subsequently called Detective James Gunzenhauser, of the Kansas City, Kansas Police Department, who interviewed Fantroy following the shooting. He testified he advised Fantroy of the shooting at his neighbor's residence and asked him if he knew anything about the crime. The only thing Fantroy could tell him was that his neighbor was a 'large black male that he knew as Rucker.' Fantroy did not tell Detective Gunzenhauser that he had seen the shooting, nor did he mention anything about a gold-colored car or a rifle. Moreover, even though Fantroy spoke with Detective Gunzenhauser about Rucker, he never mentioned that Rucker did not do the shooting.

"Following deliberations, the jury found Rucker guilty of one count each of criminal threat, a severity level 9 person felony; criminal discharge of a firearm at an occupied building, a severity level 3 person felony; and aggravated assault, a severity level 7 person felony. Because the State had moved for an upward departure sentence, the district court subsequently asked the jury to determine whether the evidence supported

5

the State's four proposed aggravating factors. After deliberations, the jury found evidence to support three of them.

"The district court denied Rucker's posttrial motions for new trial and/or a judgment of acquittal, and the case proceeded to sentencing. Based upon the aggravating factors approved by the jury, particularly the senseless and random nature of Rucker's crimes, the court imposed an upward durational departure sentence of 118 months' incarceration followed by 36 months' postrelease supervision for discharging a firearm into an occupied building. The court imposed standard sentences for the other two convictions and ordered they be served concurrent with the 118 month sentence for the discharging of a weapon crime." 2014 WL 4231234, at *1-4.

In his direct appeal, Rucker argued: (1) that the district court erred by denying his out-of-time request to file a notice of alibi witnesses, (2) that the district court erred by excluding evidence of previous shootings at the scene of the crime, and (3) that substantial competent evidence did not support the district court's upward departure sentence. This court rejected all three arguments and affirmed the district court's judgment. 2014 WL 4231234, at *13. The Kansas Supreme Court denied Rucker's petition for review on July 24, 2015. 302 Kan. 1019.

On April 1, 2016, Rucker filed a motion for relief pursuant to K.S.A. 60-1507. In his motion, he asserted that his trial counsel, Charles Ball, provided ineffective assistance of counsel for three reasons: (1) Ball failed to file a notice of alibi in a timely manner, (2) Ball did not challenge the State's cross-examination of Rucker's only witness, and (3) Ball did not attack the aggravating factors, or offer mitigating factors, used by the district court to enhance his sentence.

The district court summarily denied Rucker's petition in a memorandum decision on June 6, 2017. In that decision, the district court noted that Rucker failed to maintain contact with his attorney before trial, and the court found this action led to Ball's failure

6

to file an alibi notice in time. The district court also rejected Rucker's assertions that Ball deficiently represented him during the trial or during sentencing. Rucker timely appealed.

ANALYSIS

On appeal, Rucker argues that the district court erred in failing to hold an evidentiary hearing on the allegations of ineffective assistance of counsel as there were factual questions that required a hearing. He asserts that his trial counsel was ineffective for three reasons: (1) failure to file a notice of alibi, (2) failure to intervene in the cross-examination of a witness at trial, and (3) failure to challenge the enhanced sentence. Alternatively, Rucker argues that even without a hearing, he should be entitled to relief because the record conclusively shows that he received ineffective assistance of counsel, requiring the reversal of his convictions and a new trial.

The State argues that Rucker's actions led the district court to exclude the alibi witnesses, and so even if Rucker's statements are true, Ball's failure to timely file an alibi notice would not amount to ineffective assistance of counsel. The State also argues that Rucker failed to identify how his attorney's behavior during the cross-examination of a favorable witness was deficient. Finally, the State argues that his attorney made a constitutionally sufficient argument against the departure sentence.

A district court may summarily deny a K.S.A. 60-1507 motion if the court determines that the motion, files, and case records conclusively show that the movant is entitled to no relief. K.S.A. 2017 Supp. 60-1507(b); *Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014). A movant bears the burden of establishing the need for an evidentiary hearing and to meet this burden, a movant's contentions must be more than conclusory. *Sola-Morales*, 300 Kan. at 881 (quoting *Holmes v. State*, 292 Kan. 271, 274, 252 P.3d 573 [2011]). Finally, where the motion alleges facts not in the original record that, when taken as true, would entitle the movant to relief, the district court errs by

7

denying a full evidentiary hearing. *Swenson v. State*, 284 Kan. 931, 939, 169 P.3d 298 (2007).

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales*, 300 Kan. at 882 (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]). The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014).

*Notice of alibi*

Under Kansas law, a defendant who wants to offer evidence that he or she is not guilty of a crime by reason of being at some other place when the crime was committed must file a notice of alibi. K.S.A. 22-3218(1). This notice must state where the defendant claims he or she was at the time of the crime and must endorse the names of the witnesses the defendant wants to use in support of each contention. K.S.A. 22-3218(1). The notice must be served on the prosecuting attorney at least seven days before the start of the trial, but for good cause shown the court may permit notice at a later date. K.S.A. 22-3218(2).

Kansas appellate courts have ruled that counsel's failure to investigate, contact, or provide notice of alibi witnesses is ineffective assistance of counsel. See, e.g., *State v. James*, 31 Kan. App. 2d 548, 553-55, 67 P.3d 857 (2003); *State v. Thomas*, 26 Kan. App. 2d 728, 731-32, 993 P.2d 1249 (1999); *State v. Sanford*, 24 Kan. App. 2d 518, 522-23, 948 P.2d 1135 (1997). But when a defendant's trial counsel conducts a thorough investigation of the facts, witnesses, and law and concludes, as a matter of strategy, not to

call an alibi witness, counsel's representation is presumed to be effective. See *Shumway v. State*, 48 Kan. App. 2d 490, 499-500, 512-13, 293 P.3d 772 (2013).

Here, contrary to the State's assertions, the record is unclear as to what Ball knew about the alibi witnesses, what action he could have taken to investigate the witnesses, and whether he could have timely filed a notice of alibi witnesses. In his K.S.A. 60-1507 motion, Rucker asserted that members of his family gave Ball the names of seven alibi witnesses during the summer of 2012. The motion also asserted that these witnesses would have testified that Rucker was away from the scene of the crime at the time of the shooting and was otherwise busy with the witnesses when the crimes were committed. The trial did not begin until October 29, 2012, so the deadline to file the alibi notice was October 22, 2012. If the allegations in Rucker's motion are considered to be true, then Ball had the necessary information to timely file a notice of alibi witnesses.

At the pretrial hearing in which the district court denied Ball's request to file an alibi notice out of time, Ball told the district court that Rucker had failed to maintain contact with him before the trial. Ball also stated that Rucker had provided a list of alibi witnesses sometime before October 22, 2012, but that the list was "incomplete in the information necessary to comply with the statute." Ball informed the district court that Rucker updated the information on the last day to endorse alibi witnesses, and Ball was unable to file the notice on time. In denying Rucker's K.S.A. 60-1507 motion, the district court apparently accepted Ball's version of the facts and found that Rucker "did not provide the outstanding information needed to file the [alibi] notice until the statutory time period had expired."

Clearly a fact issue is presented on whether Rucker provided Ball with sufficient information to timely file an alibi notice. Rucker's assertions, taken as true, establish that his attorney failed under the first prong of the *Strickland* test. Rucker's entire defense was that someone else was the shooter. An alibi defense is key to that argument. Rucker

9

alleges that Ball knew the names of alibi witnesses and the nature of their testimony well before the October 22, 2012 deadline to file a timely notice. Furthermore, the record and motion imply that Ball failed to investigate the alibi witnesses at all, despite having the names and information about the alibi for months.

To be entitled to relief, Rucker must show that there is a reasonable probability the jury would have reached a different result absent the deficient performance. See *Sola-Morales*, 300 Kan. at 882. Here, the State had only one witness, Willis, who identified Rucker as the shooter. Rucker produced a witness at trial, Fantroy, who testified that he was at the scene of the crime and Rucker was not the shooter. Apparently, the jury found Willis to be a more credible witness than Fantroy. Yet it is reasonably probable that the outcome of the trial would have been different had Rucker been allowed to call up to seven alibi witnesses in his defense.

We conclude the district court erred by summarily denying Rucker's K.S.A. 60-1507 motion on the alibi issue. The motion, files, and case records do not conclusively show that Rucker is entitled to no relief on this claim. Because there are significant factual questions about Ball's investigation into alibi witnesses and whether he could have filed a timely notice, we must remand this claim for an evidentiary hearing.

*Witness cross-examination*

Next, Rucker claims that Ball was ineffective because he did not challenge the State's cross-examination of Fantroy. At trial, Fantroy testified that he lived next door to the scene of the shooting. Fantroy maintained that he got a good look at the shooter and it was not Rucker. During his cross-examination, the State impeached Fantroy for potential bias based on his connections to Rucker and his family. Fantroy also admitted that he was on probation for aggravated battery and drug possession. He also acknowledged that a

10

detective had spoken with him following the shooting and he did not tell the detective that he had seen the shooting. Ball did not object to the State's impeachment of Fantroy.

The State argues that Ball's failure to intervene in the cross-examination of Fantroy was a strategic decision by counsel. If counsel has made a strategic decision after a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is virtually unchallengeable. See *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013) (quoting *Strickland* 466 U.S. at 690-91).

Much of the State's impeachment of Fantroy was proper and there was no basis for Ball to object. For instance, the State had a right to impeach Fantroy for potential bias based on his connections to Rucker or his family. See K.S.A. 60-420. The State also was entitled to question Fantroy about prior convictions associated with dishonesty or false statements. See K.S.A. 60-421.

That said, as asserted in Rucker's K.S.A. 60-1507 motion, the State questioned Fantroy about his relationship with someone named "Red" without producing any evidence on how "Red" was connected to Rucker or his family, leaving the jury to speculate on how "Red" was connected to the case. The State also brought out on cross-examination that Fantroy was on probation for aggravated battery and possession of drugs, even though these convictions do not involve crimes of dishonesty. Ball did not object to these questions during cross-examination of Fantroy, even though it appears he may have had a legal basis to do so.

Rucker's claim of ineffective assistance of counsel based on the cross-examination of Fantroy presents a closer question on whether an evidentiary hearing is necessary than the claim about the alibi witnesses. But we are unable to conclude based solely on the record that Ball's failure to intervene during the cross-examination of Fantroy was a strategic decision made by Ball. Rucker's assertions in his K.S.A. 60-1507 motion on this

11

issue, if assumed to be true, establish deficient performance by Ball under the totality of the circumstances. Given that Fantroy was Rucker's only witness at trial, there is a reasonable probability that the jury would have reached a different result absent the deficient performance. See *Sola-Morales*, 300 Kan. at 882. We conclude the district court erred in summarily denying Rucker's claim on this issue because the motion, files, and case records do not conclusively show that Rucker is entitled to no relief.

*Departure sentence*

Finally, Rucker claims that Ball was ineffective because he did not attack the aggravating factors used by the district court to enhance his sentence. Before trial, the State moved for an upward durational departure sentence requesting that, in the event of a guilty verdict, the district court convene a departure sentencing hearing and allow the jury to determine whether any aggravating factors supported such a departure sentence. The motion indicated the State intended to offer evidence in support of three nonstatutory aggravating factors and one statutory aggravating factor. After the jury convicted Rucker, the district court instructed the jury to determine whether the evidence supported the State's proposed aggravating factors. Rucker presented no evidence and only briefly argued that the State had presented insufficient reasons to justify a departure.

After deliberations, the jury found evidence to support three of the State's proposed aggravating factors:  (1) Rucker failed to render aid to Langston, manifesting excessive brutality, (2) Rucker was not amenable to the standard sentence, and (3) the senseless and random nature of shooting Langston. The district court imposed an upward durational departure sentence of 118 months' imprisonment, which was double the presumptive sentence for the primary crime.

Rucker's K.S.A. 60-1507 motion alleged that Ball's performance was deficient because he did not attack the aggravating factors used by the district court to enhance his

12

sentence. The record establishes that Ball presented no evidence at the sentencing hearing and made only a brief argument that the State had presented insufficient reasons to justify a departure. The district court rejected Rucker's K.S.A. 60-1507 motion on this issue finding that Rucker's claim "is conclusory in nature, has been decided by the appellate courts and a K.S.A. 60-1507 motion is not a substitute for a direct appeal."

The district court erred in finding that Rucker's claim on this issue had already been decided by the appellate courts. Although this court found in Rucker's direct appeal that at least one aggravating factor had been supported by substantial evidence, this court did not address Rucker's claim that his counsel was ineffective in failing to attack the aggravating factors. We also disagree that Rucker's claim on this issue is conclusory in nature. The record indicates that Ball presented no evidence to attack the aggravating factors used by the district court to enhance his sentence. Moreover, Ball made only a brief argument that the aggravating factors were insufficient to enhance his sentence. It appears that Ball made little effort to defend against the State's departure motion, which would constitute deficient performance absent evidence that Ball's performance was part of a strategic decision. Given that the departure sentence was double the presumptive sentence for the primary crime, Rucker has shown potential prejudice on this claim.

In sum, we are unable to find that the motion, files, and case records conclusively show that Rucker is entitled to no relief on his claims of ineffective assistance of counsel. Thus, we reverse the district court's summary denial of Rucker's K.S.A. 60-1507 motion and remand for an evidentiary hearing on Rucker's claims. We reject Rucker's alternative argument that, even without a hearing, the record conclusively shows that he received ineffective assistance of trial, requiring the reversal of his convictions and a new trial.

Reversed and remanded.

13